185 N.J. Super. 507 (1982)
449 A.2d 1324
IN THE MATTER OF EGG HARBOR ASSOCIATES (BAYSHORE CENTRE) IMPOSITION OF CONDITIONS OF COASTAL AREA FACILITY PERMIT # CA-79-0231-5.
Superior Court of New Jersey, Appellate Division.
Argued March 29, 1982.
Decided June 29, 1982.
*510 Before Judges MILMED, JOELSON and GAULKIN.
Robert N. McAllister argued the cause for appellant Egg Harbor Associates (Valore, McAllister, Westmoreland & Vesper, attorneys; John M. Toscano on the brief).
John M. Van Dalen, Deputy Attorney General, argued the cause for respondent Division of Coastal Resources, Department of Environmental Protection (Irwin I. Kimmelman, Attorney General, attorney; James R. Zazzali, former Attorney General, and John M. Van Dalen on the brief).
Kenneth E. Meiser argued the cause for New Jersey Department of the Public Advocate, amicus curiae (Joseph H. Rodriguez, Public Advocate, attorney; Stanley C. Van Ness, former *511 Public Advocate, Kenneth E. Meiser and Carl S. Bisgaier on the brief).
The opinion of the court was delivered by GAULKIN, J.A.D.
Egg Harbor Associates (Associates) appeals from a decision of the Director of the Division of Coastal Resources, Department of Environmental Protection (DEP) imposing "fair share" housing conditions upon a permit issued to Associates under the Coastal Area Facility Review Act (CAFRA) (N.J.S.A. 13:19-1 et seq.) for a waterfront development including 1530 proposed housing units in Egg Harbor Township, Atlantic County. The conditions challenged on the appeal are these:
The applicant shall be required to provide a percentage of low and moderate income housing. Specifically, the applicant shall submit a detailed Low and Moderate Income Housing Plan to the Division for review and approval, prior to construction, that includes:
a. Provide that of the 1,530 housing units, 10% shall be low income units and 10% shall be moderate income units. The units may be built on-site or off-site provided that the units comply with the Rules on Coastal Resources and Development, particularly concerning public services.
b. The 10% low income housing shall be Section 8 housing or any government subsidy program which is comparable to or a replacement for Section 8 housing.
c. The applicant shall make all possible attempts to secure Section 8 funding and shall submit quarterly reports documenting such attempts to the Division. Failure to pursue such efforts to the fullest extent possible shall be ground for revocation of the CAFRA permit.
d. If the applicant does not obtain a commitment for Section 8 funding within three years of the date of issuance of the CAFRA approval, the applicant shall donate appropriate improved lands or funds to a housing agency or to a non-profit developer who is prepared to seek subsidies and construct the units.
e. The applicant may provide the 10% of moderate income units through either Section 235 housing, through any government subsidy program which is comparable to or a substitute for Section 235, or through unsubsidized units which do not sell for more than twice the income level for Section 235 housing for the bedroom size being constructed.
f. The applicant shall establish a mechanism for assuring that these moderate income units are sold only to moderate income persons.
g. The applicant shall establish a mechanism for establishing re-sale controls on these moderate income units.
h. The applicant shall establish a timetable which insures that a reasonable proportion of the low and moderate income units will be built by no later than the occupancy date of 30% of the the other units in the project.
*512 Associates applied on March 30, 1979 for a CAFRA permit to construct a large-scale planned unit development (N.J.A.C. 7:7E-8.11) on a 127.664-acre tract; the proposed development includes, in addition to the housing units, a 500-room hotel, 4200 parking places and 450,000 square feet of office, commercial and indoor recreational space. In December 1979 the DEP issued its Staff Preliminary Analysis which noted that "to appreciate the scope of this proposed development consider that in 1970 there were only 3489 occupied housing units in Egg Harbor Township (1970 Census) and that in 1978, only 1568 building permits were issued in all of Atlantic County." The analysis further found that although the proposed development "is being built in direct response to the expected housing growth pressures caused by casino gambling in the older, urban core of Atlantic City," the project "does not represent, strictly speaking, increased low and moderate income housing opportunities to relieve the housing burdens of the region"; that the DEP had requested the applicant to "address the feasibility of providing a reasonable amount of least-cost housing either on-site or within the region," and that the applicant has responded
... with the contention that the appropriate "mix" for the proposed site is geared toward middle and upper income housing demand. Furthermore, the applicant has indicated that a more diverse stratification of housing types, on-site would prove to be economically and socially disfunctional.
The analysis asked that Associates document that contention:
The applicant shall submit documented rationale in support of the contention that the BayShore Centre project cannot feasibly support low or moderate income housing.
In addition, the applicant shall specify the extent of presently contemplated off-site commitments to provide least-cost housing within the region.
That request was made pursuant to N.J.A.C. 7:7E-8.6(a)[1] which required that housing developments approved under CAFRA "shall provide least-cost housing where feasible."
Associates' response was submitted on May 22, 1980:

*513 The question of the feasibility of the proposed development providing a fair share of the municipalities low and moderate cost housing requires substantive discussion with regard to the public and private sector financing mechanisms that would allow for the inclusion of a certain percentage of low-moderate income units.
The improved land costs per residential unit in the Bayshore Centre project is estimated to be in excess of $30,000-$35,000. This figure includes the cost of land and improvements, carrying costs of the property over the last two years, developer's profit and the added expense as a result of the need for pilings, estimated to range from 40 feet to 70 feet in depth. This figure does not include the costs associated with the construction of the residential units.
The high costs associated with development of the project site as well as the nature of the project has resulted in land costs of sufficient magnitude to eliminate the feasibility of public financing mechanisms. The project will be entirely financed through private organizations. Thus the financial feasibility of low income housing is nonexistent under existing subsidy programs.
It should be mentioned that conversations with contractors and officials within Egg Harbor Township indicate that a substantial quantity of the existing housing is in the low-moderate range and/or financed through public mechanisms. Of the estimated 6800 residential units in the Township, 1832 units are mobile homes, 600 others are FHA financed and 1300 others are financed by Section 235 and 236. This total represents approximately 50% of the total housing in Egg Harbor Township. It would appear that the Township has done its fair share to incorporate low-moderate income housing. Bayshore Centre will provide the Township with needed revenues generated from moderate income housing.
The Applicant is involved in other activities within the County that will aid in supplementing the supply of low-moderate income housing. Currently, an estimated 300 units of senior citizen housing sponsored by the Applicant is proposed in other areas of Atlantic County.
In his Opinion No. 73, dated August 29, 1980, the Director of the DEP Division of Coastal Resources conditionally approved the issuance of a CAFRA permit. In his discussion of the fair share housing question the Director said that "the Division disagrees" with the applicant's position and cited recent studies and analyses which showed an "unquestioned need" for low- and moderate-income housing in the Atlantic City region. He stated that a major residential developer can either build publicly-assisted *514 housing on-site or off-site, using available subsidy programs, or can use "internal subsidies, such as a contribution of improved land or funds to an appropriate housing agency or non-profit developer," and that the "appropriate scale" of any CAFRA applicant's contribution to regional housing needs "will depend upon the scale of residential development proposed by the applicant." The Director concluded:
The Bayshore Centre application is the largest residential or mixed use development in Atlantic County to receive a CAFRA permit since CAFRA took effect in 1973. As a significant, region-shaping development, Bayshore Centre has an opportunity to make an equally significant contribution to meeting the full range of the region's housing needs. The appropriate required percentage of low and moderate income housing for a project the scale of Bayshore Centre (1,530 units) is 10% low income (153 units) and 10% moderate income (153 units) based on the following reasons and precedents. First, 20% low and moderate income housing represents only a small share of the expected households in the county that will need housing assistance in the 1980's. Second, several local governments mandate that planned unit developments provide a required percentage of low and moderate income housing, such as East Windsor (20%) and South Brunswick (15-25%). Third, the New Jersey Supreme Court, in Oakwood-at-Madison v. Township of Madison, 72 N.J. 481-512 (1977), required a developer challenging a local exclusionary ordinance to "... guarantee the allocation of at least 20% of the units to low and moderate income families."
To provide the applicant with flexibility in the timing to comply with this requirement, yet ensure that the needed housing will indeed be built, the applicant must establish a realistic timetable for construction of a reasonable portion of the units, by no later than the occupancy date of 30% of the other units in the project.
The issue of housing is of paramount concern to State, County and local governments. The growth demands resulting from casino gaming in Atlantic City, coupled with Atlantic County's environmental sensitivity and generally limited growth capacity, present real challenges which must be addressed cooperatively by the public and private sectors. For example the Casino Control Commission is addressing this issue with casino licenses.
The conditional permit was thereupon issued to Associates under date of August 29, 1980. Associates was advised that it had two avenues of appeal: to the Coastal Area Review Board whose role is restricted "to the declaration of public policy concerning the development of the coastal area" (N.J.A.C. 7:7D-1), or to the DEP Commissioner by "a plenary (quasi-judicial) hearing before a hearing officer" who would "make findings of fact, conclusions of law and recommendations to the Commissioner *515 on whether to affirm, modify, or reverse" the decision of the Division of Coastal Resources. N.J.A.C. 7:7D-2.8.
Associates elected not to request a plenary hearing before a hearing officer and waived that right by seeking a review before the Coastal Area Review Board. N.J.A.C. 7:7D-2.8(a). However, because of apparent miscommunication between the Attorney General and Associates, no hearing before the Coastal Area Review Board was conducted and this appeal was filed. During the pendency of the appeal the Attorney General moved to remand the matter to the Coastal Area Review Board to conduct the omitted hearing; the remand was objected to by Associates and denied by this court.

I
Associates' initial contention is that imposition of "fair share" housing conditions is beyond the authority delegated to the DEP under CAFRA. The essence of the argument, as stated in Associates' brief, is that
... the purpose of the CAFRA Law is to protect the physical, chemical and biological environment from initial and continued degradation and in no way has delegated to N.J. DEP the wide-ranging asserted authority to make socio-economic policy on the basis of considerations divorced from environmental concerns.
We find this reading of CAFRA to be too narrow. The statute is directed to "an exceptional, unique, irreplaceable and delicately balanced, physical, chemical and biologically acting and interacting natural environmental resource called the coastal area" (N.J.S.A. 13:19-2), and expresses a broad range of concerns well beyond what Associates describes as mere "environmental concerns." The sweep of the legislation is suggested in its prefatory findings and declarations which set forth that
... certain portions of the coastal area are now suffering serious adverse environmental effects resulting from existing facility activity impacts that would preclude or tend to preclude those multiple uses which support diversity and are in the best long-term, social, economic, asthetic and recreational interest of all people of the State; and that, therefore, it is in the interest of the people of the State that all of the coastal area should be dedicated to those kinds of land uses which promote the public health, safety and welfare, protect public and *516 private property, and are reasonably consistent and compatible with the natural laws governing the physical, chemical and biological environment of the coastal area. [N.J.S.A. 13:19-2]
The same section sets forth that the legislature
further recognizes the legitimate economic aspirations of the inhabitants of the coastal area and wishes to encourage the development of compatible land uses in order to improve the overall economic position of the inhabitants of that area within the framework of a comprehensive environmental design strategy.... [Ibid.]
In keeping with these comprehensive goals CAFRA prohibits all construction of facilities in the coastal area except upon receipt of a permit granted under the act. N.J.S.A. 13:19-5. The application for permit requires submission of an environmental impact statement which, among other requirements, must set forth an inventory of existing "environmental conditions" and an assessment of the "probable impact of the project" thereon, including the "demography" and "land use" of the project site. N.J.S.A. 13:19-7(a), (d). No permit may issue except upon a finding by the DEP that the proposed construction will not "impair the public health, safety and welfare." N.J.S.A. 13:19-10. A permit, moreover, may be rejected if the proposed facility "would violate or tend to violate the purpose and intent" of the CAFRA act, or "would materially contribute to an already serious and unacceptable level of ... resource exhaustion"; and a permit may be issued "subject to such conditions as [the Commissioner] finds reasonably necessary to promote the public health, safety and welfare...." N.J.S.A. 13:19-11.
Moreover, CAFRA mandates the Commissioner to prepare an "environmental inventory" of the coastal area "and of the existing facilities and land use developments within the coastal area and an estimate of the capability of the various areas within the coastal area to absorb and react to man-made stresses," and to develop therefrom
... alternate long-term environmental management strategies which take into account the paramount need for preserving environmental values and the legitimate need for economic and residential growth within the coastal area. [N.J.S.A. 13:19-16]
*517 After developing such alternate management strategies the Commissioner is directed to select from them an "environmental design" for the coastal area which
... shall include a delineation of various areas appropriate for the development of residential and industrial facilities of various types, depending on the sensitivity and fragility of the adjacent environment to the existence of such facilities. [Ibid.]
CAFRA, therefore, clearly vests in DEP the authority to oversee and plan land development, including residential development, in the coastal area. We find it equally clear that CAFRA mandates DEP to utilize, in performing that statutory role, all relevant considerations of an enlightened public policy. The statutory directives to "promote the public health, safety and welfare" and to advance the "best long term, social, economic, aesthetic and recreational interest of all people of the State" are not, in our view, reasonably subject to any narrower reading. We find nothing in Toms River Affiliates v. Environmental Protection Dep't, 140 N.J. Super. 135 (App.Div. 1976), certif. den. 71 N.J. 345 (1976), or Public Interest Research Group v. State, 152 N.J. Super. 191 (App.Div. 1977), certif. den. 75 N.J. 538 (1977), persuasive of a contrary view. Although Associates urges that those cases limit the authority of the DEP under CAFRA to mere "environmental concerns," we find no such holdings there; rather, we read those cases to confirm our own view that the DEP may and must include in its land use planning all relevant criteria, including, as here, the social and economic impact of development.
Nor can it fairly be disputed that provision for low-and moderate-cost housing is an appropriate goal to be fixed in the effort to promote the public welfare. Our public policy in this regard is, as clearly stated in South Burl. Cty. N.A.A.C.P. v. Mount Laurel Tp., 67 N.J. 151 (1975), app. dism. 423 U.S. 808, *518 96 S.Ct. 18, 46 L.Ed.2d 28 (1975) (Mt. Laurel), that the zoning power in developing areas[2] must be exercised so as to provide
... the reasonable opportunity for appropriate variety and choice of housing, including, of course, low and moderate cost housing, to meet the needs, desires and resources of all categories of people who may desire to live within its boundaries. [at 179]
Indeed, even in the absence of the broad language of CAFRA, the DEP would be constitutionally obligated, so long as it has authority to control coastal area residential development, to affirmatively combat exclusion therefrom of lower-income housing where needed. As the court said in Oakwood at Madison, Inc. v. Madison Tp., 72 N.J. 481 (1977), in discussing the scope and interpretation of the zoning enabling law:
... [T]he zoning statute is to be construed to conform with state due process and equal protection so as to compel zoning in developing municipalities to affirmatively combat exclusion of the lower income population needing housing. [at 547]
We conclude, therefore, that in its effort to provide for low-and moderate-income housing in the coastal area the DEP is appropriately responding both to the directives of CAFRA and to the constitutional mandate of Mt. Laurel.

II
Associates further argues that even if the DEP may properly consider low- and middle-income housing needs in its coastal area permit grants, it is without statutory authority to "engage in inclusionary zoning, i.e., requiring low and moderate income housing to be built." Associates relies in major part on the "reserved position" expressed by the Supreme Court in Oakwood at Madison, Inc. v. Madison Tp., supra, with respect to "rent skewing," which the court defined to include zoning requirements *519 that "a mandatory percentage of moderately priced dwellings be constructed":
Although this is also a widely recommended zoning technique for handling the problem of encouraging private construction of lower income housing, we discern serious problems with the exercise of local zoning power in such a manner without express legislative authorization. See Board of Supervisors v. DeGroff Enterprises Inc., 214 Va. 235, 198 S.E.2d 600 (Sup.Ct. 1973); Annot. 62 A.L.R.3d 880 (1975). We will not here resolve the issue in the absence of adequate argument on the matter. However, we are not to be understood as discouraging local initiative in this area; the question, moreover, deserves legislative study and attention. [72 N.J. at 518-519]
We are concerned here, of course, not with the scope of municipal zoning powers under N.J.S.A. 40:55D-1 et seq. but solely with the scope of the DEP's authority under CAFRA. We are entirely satisfied that a fair and sympathetic reading of CAFRA requires the conclusion that the DEP's imposition of the challenged permit conditions was well within its legislative grant of authority.
Certainly there is nothing in CAFRA that specifically limits the tools available to the DEP in fulfilling its obligation to make provision for low- and middle-income housing in the coastal area. To the contrary, as we have already undertaken to show, the statute describes in the broadest of terms the DEP's obligations in implementing the legislative policy. Those legislative directives serve as authority for administrative action and should be liberally construed in order to enable the DEP to accomplish its statutory responsibilities. New Jersey Guild of Hearing Aid Dispensers v. Long, 75 N.J. 544, 561-562 (1968); In re Promulgation of Rules of Practice, 132 N.J. Super. 45, 48 (App.Div. 1974), certif. den. 67 N.J. 95 (1975). Particularly here, where the DEP is directed to "promote the public health, safety and welfare" (N.J.S.A. 13:19-2), we should readily imply such incidental administrative powers as are necessary and appropriate to effectuate fully the legislative intent. In re Heller Suspension, 73 N.J. 292, 303-304 (1977); New Jersey Guild of Hearing Aid Dispensers v. Long, supra.
*520 Considerations of this very nature were found in In Review of Health Care Adm. Bd. v. Finley, 168 N.J. Super. 152 (App.Div. 1979), aff'd 83 N.J. 67 (1980), app. dism. 449 U.S. 944, 101 S.Ct. 342, 66 L.Ed.2d 208 (1980), to validate Department of Health regulations requiring proprietary health care facilities to accept and treat a certain number of indigent patients. In rejecting the contention that the regulations were without statutory authority, Judge Conford acknowledged that the statute in question "neither expressly prohibits nor permits the regulations in question." However, relying upon the "broadly comprehensive terms" of the statutory declaration of policy and its grant of authority, "liberally construed in order to enable the agency to accomplish its statutory responsibilities," he concluded:
If the Department of Health has the authority ... to promulgate regulations requiring health providers to deliver needed services, then it follows in our view that it may employ its licensing function to enforce those regulations. [168 N.J. Super. at 162]
In affirming the judgment of this court the Supreme Court, through Justice Sullivan, succinctly endorsed Judge Conford's analysis:
Although the statute does not contain an express grant of power to the Commissioner to allocate beds to indigents, we find that power is implied. Delegation of authority to an administrative agency is construed liberally when the agency is concerned with the protection of the health and welfare of the public. [83 N.J. at 79]
We find the reasoning and holding of the Finley case persuasive. Here the DEP has the statutory obligation to provide for those land uses which promote the public health, safety and welfare, and is subject to our clearly stated public policy that provisions must be made for low and middle income housing. The conditioning of permits by the DEP upon the provision of such housing is an entirely rational means to attain those salutary public ends. See, generally, Kleven, "Inclusionary Ordinances  Policy and Legal Issues in Requiring Private Developers to Build Low Cost Housing," 21 U.C.L.A.L.Rev. 1432 (1974); Rose, "The Mandatory Percentage of Moderately Priced Dwelling *521 Ordinance (MPMPD) Is the Latest Technique of Inclusionary Zoning," 3 Real Estate L.J. 176 (1974).
The peculiar need for the DEP to resort to this initiative is made evident by reference to the environmental management strategy, described and implemented in N.J.A.C. 7:7E-1.1 et seq. The coastal area is there divided into three basic growth categories (N.J.A.C. 7:7E-6.3), only one of which includes areas where high-density residential development is permitted. (N.J.A.C. 7:7E-6.7(b)(4)(i)). The record in this proceeding shows that a third or less of the entire coastal area is in this high-growth category. Since the approved strategy so severely limits and concentrates possible residential development within the coastal area, any failure of the DEP to mandate "fair share" housing in a project of the size contemplated here could seriously impair "the reasonable opportunity for an appropriate variety and choice of housing" in the coastal area. Mt. Laurel, 67 N.J., supra at 179. Indeed, in Mt. Laurel itself the Supreme Court indicated that approval of such a large-scale development would necessarily be conditioned on its provision of "fair share" housing:
If planned unit developments are authorized, one would assume that each must include a reasonable amount of low and moderate income housing in its residential "mix," unless opportunity for such housing has already been realistically provided for elsewhere in the municipality. [Id. at 187]
And as already noted, in Oakwood at Madison, Inc. v. Madison Tp., supra, the Supreme Court itself ordered the issuance of a permit conditioned to "guarantee the allocation of at least 20% of the units to low or moderate income families" (72 N.J. at 551).
We conclude, therefore, that the imposition of the challenged conditions was not beyond the authority delegated to the DEP under CAFRA.

III
Associates also urges that "it is arbitrary, capricious and unreasonable, and beyond the police power" for the DEP to require it "to provide a particular type of housing and to rent or *522 sell that housing at a particular price." The contention blends two quite distinct arguments. Associates first argues that
... the imposition of the condition amounts realistically to the proposition that N.J. DEP constitutionally possesses the power to require that the developer realize less profit, no profit or a loss on the low and moderate income units.
The permit conditions are not invalid, of course, simply because they may restrict Associates' property rights or prevent it from obtaining the maximum possible return from its property. See, e.g., Hutton Pk. Gardens v. West Orange, 68 N.J. 543, 555-565 (1975). As the Supreme Court noted in rejecting a similar argument made against the indigent patient regulations approved in N.J. Ass'n of Health Care Facilities v. Finley, supra:
Restrictions on the use of property, if in furtherance of a valid governmental purpose, serve the public interest and are considered a proper exercise of the police power even though they may result in some economic disadvantage. [83 N.J. at 81]
Although conditions of the kind imposed here might be found unreasonable or confiscatory as applied to a particular fact setting [ibid.], Associates waived its right to a plenary hearing before the Office of Administrative Law at which it could have presented its proofs in support of any such contention (N.J.A.C. 7:7D-2.8(a)); and at oral argument before us counsel for Associates specifically disavowed any request for or interest in a remand for such a hearing. Accordingly, Associates cannot assert that the effect of the challenged conditions is unreasonable or confiscatory as applied to its proposed project. Cf. Troy Hills Village v. Parsippany-Troy Hills Tp., 68 N.J. 604 (1975).
The second facet of Associates' argument is that it can only be compelled to assume a cost which bears a rational nexus to the needs created by, and the benefits conferred upon, its development. See, e.g., Brazer v. Mountainside, 55 N.J. 456, 465-66 (1970). Associates' principal reliance is placed on Property Owners Ass'n of North Bergen v. North Bergen Tp., 74 N.J. 327 (1977), which invalidated a municipal ordinance fixing special restrictions on rent increases for needy senior citizen tenants.
*523 We find the argument without merit. If the "rational nexus" test of Brazer and like cases is to be applied, the required nexus is surely shown here. Given the size and scope of Associates' project and the stringent limitations on large-scale development of housing in the coastal area, the "fair share" housing requirement imposed on Associates must be said to be rationally related to the benefits and burdens created by the project itself.
Moreover, a restriction on the use of property, although it does impose an economic cost, is not to be evaluated in terms of the particular "needs" or "benefits" generated by the property in question; the test of such a restriction, rather, is whether it is reasonably designed to promote the public interest and is not confiscatory. See, e.g., Morris County Land, etc. v. Parsippany-Troy Hills Tp., 40 N.J. 539 (1963); Hutton Pk. Gardens v. West Orange, supra. The holding in Property Owners Ass'n of North Bergen v. North Bergen Tp., supra, is entirely consistent with this approach to land use restrictions; that case was capsulized by Justice Sullivan in N.J. Ass'n of Health Care Facilities v. Finley, supra, as standing for the proposition that mandated subsidization by a property owner is not unconstitutional "as long as it is not excessive." 83 N.J. at 84. Associates has not only failed to show that the economic impositions of the challenged conditions are "excessive" but, as we have already noted, has specifically declined here and below the opportunity to do so.

IV
The remaining issues raised require only brief comment. The fact that CAFRA authorizes the DEP to impose "fair share" housing conditions in the coastal area alone does not render the statute a special law or deprive coastal area landowners of equal protection. See Toms River Affiliates v. Environmental Protection Dep't, supra, 140 N.J. Super. at 145-148. Nor was there any impropriety in the imposition of the permit conditions notwithstanding that comprehensive regulations had not yet been promulgated. Cf. In re Heller Suspension, supra, *524 73 N.J. at 305-306. And, since the conditions could lawfully be imposed without the prior promulgation of comprehensive regulations, we find it unnecessary to consider the asserted vagueness of regulations which are now superseded.
The decision of the Director of the Division of Coastal Resources, Department of Environmental Protection, imposing the conditions discussed herein is affirmed.
NOTES
[1] The DEP had promulgated rules under CAFRA (N.J.S.A. 13:1D-9) effective September 28, 1978. The "fair share" or "affordable" housing rule was thereafter amended in 1980 and 1981; both amendments carry forward the requirement that "where feasible" residential developments provide "least cost" or "affordable housing for low and moderate income households". N.J.A.C. 7:7E-7.2; 14 N.J.R. 206(a) (1982); 13 N.J.R. 864(a) (1981).
[2] The responsibility of the DEP over the coastal area is comparable to that of a municipal governing body over the municipality (Toms River Affiliates v. Environmental Protection Dep't, supra, 140 N.J. Super. at 146) and the coastal area is fairly equated with a "developing municipality." See Mount Laurel, supra, 67 N.J. at 160.