[S.F. No. 24767. Aug. 11, 1986.]

RICHARD PENNELL et al., Plaintiffs and Appellants, v.
CITY OF SAN JOSE, Defendant and Appellant.

■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■

COUNSEL

Burch Fitzpatrick and Miller, Starr & Regalia for Plaintiffs and Appellants.

Jon D. Smock and Wilbur H. Haines III as Amici Curiae on behalf of Plaintiffs and Appellants.

Robert J. Logan, City Attorney, Joan R. Gallo, Acting City Attorney, Daniel J. Wallace, Assistant City Attorney, Robert R. Cimino, Senior Deputy City Attorney, and William B. Mayfield, Deputy City Attorney, for Defendant and Appellant.

Myron Moskovitz, Natalie West, City Attorney (Berkeley), and James R. Grow, Assistant City Attorney, as Amici Curiae on behalf of Defendant and Appellant.

OPINION

GRODIN, J.—Defendant city appeals, and plaintiffs landlord and association cross-appeal, from a judgment of the Santa Clara Superior Court (i) declaring part of defendant's rent control ordinance facially unconstitutional and (ii) upholding the constitutionality of the ordinance's rental unit fee provision. We affirm the latter ruling and reverse the former.

*1. The City's Appeal*

In July 1979 the city enacted a rent control ordinance "to alleviate some of the more immediate needs created by San Jose's housing situation. These needs include but are not limited to the prevention of excessive and unreasonable rent increases, the alleviation of undue hardship upon individual tenants, and the assurance to landlords of a fair and reasonable return on the value of their property."

The ordinance allows a landlord to raise his rents according to the *highest* of any four methods of computation during a twelve-month period: (i) he

is automatically entitled to increase his rent by 8 percent;[1] if he deems this insufficient, he is entitled to a larger increase based on (ii) a 5 percent increase plus specified pass-through costs[2] or (iii) certain of his increased costs of debt service.[3] If he deems even these formula increases insufficient, he is entitled to (iv) a hearing to determine the amount of rent increase that is "reasonable under the circumstances."[4] In reaching this latter decision,

[1]Section 5703.2 of the ordinance provides: "Increases Subject to Review. Except as hereinafter provided, any rent increase or combination of increases occurring after March 31, 1979, and prior to the effective date of this Ordinance, and any increase after the effective date of this Ordinance, which taken together with any increase which took effect in the twelve (12) month period immediately preceding such increase, exceeds an aggregate of eight percent (8%) shall be subject to review under the Hearing Process."

[2]Section 5703.28 provides: "Standards of Reasonableness to be Applied to Rent Increases. Hearing Officers shall determine whether rent increases are reasonable under the circumstances taking into consideration that the purpose of this Ordinance is to permit landlords a fair and reasonable return on the value of their property while protecting tenants from arbitrary, capricious or unreasonable rent increases, and under certain circumstances, unjustified economic hardship. The Hearing Officer's determination shall be made with reference to the following standards:

"(a) Increases Deemed Reasonable. Where the amount of the proposed rental increase consists only of passing through one or more of the following: (i) costs of capital improvements, (ii) increased costs of maintenance and operation, or (iii) costs of rehabilitation; plus no more than five percent (5%) of the monthly rent, they shall be deemed reasonable and the Hearing Officer shall allow the entire rental increase provided that:

"(1) cost figures have been established to his reasonable satisfaction;

"(2) the costs of capital improvements if any are averaged on a per unit basis and are amortized over a period not less than sixty (60) months;

"(3) the costs of rehabilitation if any are averaged on a per unit basis and are amortized over a period not less than thirty-six (36) months;

"(4) each of the costs proposed to be passed through to tenants, whether it be costs of capital improvements, increased costs of operation and maintenance, or costs of rehabilitation, bears a reasonable relationship to the purposes for which such costs were incurred and the value of the real property to which they are applied."

[3]Subdivision (b) of section 5703.28 provides: "When Costs of Debt Service Deemed to be Reasonable. Increased costs of debt service shall be deemed reasonable and allowed by the Hearing Officer where the aggregate amount of debt from whence they arise constitutes no more than seventy percent (70%) of the value of the property as established by a lender's appraisal, and no more than eighty percent (80%) of the cost of such debt service is being passed through to the tenants. Where no lender's appraisal is available, the Hearing Officer may secure such appraisal to be paid for by the landlord as a cost of maintenance and operation."

[4]Subdivision (c) of section 5703.28 provides: "Standards Applicable to Rent Increases Which Exceed the Foregoing. When the amount of any rent increase or portion thereof exceeds any of the foregoing standards under subsections (a) or (b) of this Section, the Hearing Officer shall determine what is reasonable under the circumstances taking into account any of the following factors on which he has received information:

"(1) In the case of increased costs of debt service due to a sale or refinancing of the rental units or the building or property of which the units are a part within twelve (12) months of the increase: (i) the arms length nature of the transaction, (ii) the landlord's rate of return on the investment, (iii) the frequency of past resale or refinances, and (iv) the extent to which prior rental increases have made provisions for appreciation of asset value;

"(2) the rental history of the unit or the complex of which it is a part, including: (i) the presence or absence of past increases; (ii) the frequency of past rent increases, (iii) the

the rent control hearing officer is directed to consider and balance "any of [seven] factors on which he has received information." The ordinance thereafter lists five factors related to information to be provided by the landlord ((1) his financing costs, his (2) rental, (3) maintenance and (4) service history, and (5) "other financial information which the landlord is willing to provide"), one factor related to the housing market ((6) "existing market value of rents for [comparable] units") and one factor related to tenants: "(7) *the hardship to a tenant* . . . ." (See *ante,* fn. 4, italics added.)

Although the ordinance provides that under this fourth method for setting a rent increase the tenant hardship factor is to be "balanced" along with six other factors, it is given potentially overriding weight in a related section of the ordinance, under which the hearing officer is (i) *directed* to consider the economic or financial effect of the proposed increase on the affected tenants, and is (ii) *permitted* to disallow all or part of an increase over that allowed by the first three methods of computing a rental increase if that part of the increase would impose an unreasonably severe financial or economic hardship on a particular tenant. (*Ante,* fn. 4.) At the same time, the ordinance provides that in all cases hearing officers must allow landlords a rent increase that yields a fair and reasonable return.[5] Whereas the ordinance

---

landlord's response to Proposition 13 savings, and (iv) the occupancy rate of the complex in comparison to comparable units in the same general area:

"(3) the physical condition of the rental unit or complex of which it is a part, including the quantity and quality of maintenance and repairs performed during the last twelve (12) months;

"(4) any increases or reduction of housing services since the last rental increase before the effective date of this Ordinance;

"(5) other financial information which the landlord is willing to provide;

"(6) existing market value of rents for units similarly situated;

"(7) the hardship to a tenant as provided in Section 5703.29."

Section 5703.29 provides: "Hardship to Tenants. In the case of a rent increase or any portion thereof which exceeds the standard set in Section 5703.28(a) or (b), then with respect to such excess and whether or not to allow same to be part of the increase allowed under this Chapter, the Hearing Officer shall consider the economic and financial hardship imposed on the present tenant or tenants of the unit or units to which such increases apply. If, on balance, the Hearing Officer determines that the proposed increase constitutes an unreasonably severe financial or economic hardship on a particular tenant, he may order that the excess of the increase which is subject to consideration under subparagraph (c) of Section 5703.28, or any portion thereof, be disallowed. Any tenant whose household income and monthly housing expense meets the criteria established by the Housing Assistance Payments Program under Section 8, existing housing provisions of the Housing and Community Development Act of 1974 (P.L. 93-383) and the regulations pertaining thereto, shall be deemed to be suffering under financial and economic hardship which must be weighed in the Hearing Officer's determination. The burden of proof in establishing any other economic hardship shall be on the tenant."

[5]Section 5703.28 states: "Hearing officers shall determine whether rent increases are reasonable under the circumstances taking into consideration that the purpose of this Ordinance is to permit landlords a fair and reasonable return on the value of their property while protecting tenants from arbitrary, capricious, or unreasonable rent increases, and under

requires generally that tenants prove their economic hardship, it also provides that tenants who meet certain federal standards shall be deemed to suffer from financial hardship that "*must* be weighed in the Hearing Officer's determination." (*Ibid.*) The number of such tenants falling within the latter category is potentially high: Plaintiffs assert (and defendants do not contend otherwise) that the federal standards are met by all families whose incomes are less than 80 percent of the median family income in the area.

Plaintiffs claim the ordinance is facially unconstitutional to the extent section 5703.28, subdivision (c)(6), and section 5703.29 permit a hearing officer to "disallow" a rent increase that would otherwise be supported by the initial six factors of the fourth method for calculating a reasonable rent increase. (*Ante,* fn. 4.) ■ ■■■ They appear to have abandoned the argument suggested in their opening brief (and still implicit to some extent in their present claims) that the hardship provision renders the ordinance incapable of nonconfiscatory application.[6] They also concede that the tenant hardship factor bears a rational relationship[7] to the ordinance's stated purpose

---

certain circumstances, unjustified economic hardship. . . ." (See *post,* fn. 6.)

Contrary to suggestions in the dissent, we do not read the ordinance as establishing two different fair return standards—one for those with and one for those without hardship tenants. Instead, as emphasized above, the ordinance grants all landlords the same constitutional fair return, and simply grants to those whose tenants can afford it an additional increase above that constitutionally required.

[6]To the extent this claim is still made, we reject it. "As we made clear in *Birkenfeld* [v. *City of Berkeley* (1976) 17 Cal.3d 129 (130 Cal.Rptr. 465, 550 P.2d 1001)], whether rental regulations are fair or confiscatory depends ultimately on the result reached. (17 Cal.3d 129, 165.) That determination, of course, can only be made by analyzing a challenge to the regulation as applied. Nevertheless, we will declare a regulation invalid on its face 'when its terms will not permit those who administer it to avoid confiscatory results in its application to the complaining parties.' (*Id.,* at p. 165; see also *Cotati Alliance for Better Housing* v. *City of Cotati* (1983) 148 Cal.App.3d 280, 287, 291 [195 Cal.Rptr. 825]; *Hutton Park Gardens* v. *Town Council* (1975) 68 N.J. 543 [350 A.2d 1, 14-16].)" (*Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 679 [209 Cal.Rptr. 682, 693 P.2d 261], affd. (addressing antitrust issues only) (1986) 475 U.S. 260 [89 L.Ed.2d 206, 106 S.Ct. 1045].)

Plaintiffs cannot show the terms of the ordinance preclude those who administer it from avoiding confiscatory results. On the face of the ordinance it is clear that the "tenant hardship" factor may be considered as merely one of seven factors when a landlord seeks a rental increase over that to which he is entitled under the first three formulas for determining rental increases. The tenant hardship factor thus comes into play, if at all, only in determining what best accomplishes the dual purposes of the ordinance: (i) protecting tenants from excessive and unreasonable rent increases while (ii) assuring landlords a fair and reasonable return. Nothing in the ordinance suggests or requires that, when operating under this fourth rental increase provision, proof of tenant hardship requires disallowance of any or all of a contemplated rental increase. The hearing officer is required merely to "consider" and "balance" the tenant hardship evidence; nothing in the ordinance precludes him from granting an increase necessary to assure the landlord a fair return and thus avoid confiscatory results *despite* any resulting hardship. (See *Butterworth* v. *Boyd* (1938) 12 Cal.2d 140, 149 [82 P.2d 434, 126 A.L.R. 838].)

[7]Even though the classification is, concededly, rationally related to the goal of the ordinance, we note that the mere existence of the hardship factor might in practice tend to

of preventing excessive and unreasonable rent increases. Instead, plaintiffs argue that for the ordinance's tenant hardship provision to have any meaning, it must operate to deprive those landlords with hardship tenants of an otherwise reasonable rental increase. In essence, plaintiffs claim that although the purpose to be advanced by the hardship provisions (providing financial assistance to poor tenants) is a proper one, that burden cannot constitutionally be placed on individual landlords who happen to have hardship tenants.

As the parties observe, no California case has addressed the specific issue posed here; indeed, we are aware of no other rent control ordinance that contains a tenant financial hardship provision, let alone one that operates like this one.[8] Plaintiffs claim the ordinance is unconstitutional for at least two reasons.

■ They first assert the ordinance arbitrarily selects those landlords with hardship tenants to bear a burden that should be borne by all of society in contravention of *Dept. of Mental Hygiene* v. *Kirchner* (1964) 60 Cal.2d 716, 721 [36 Cal.Rptr. 488, 388 P.2d 720, 20 A.L.R.3d 353]. In *Kirchner* we held that equal protection principles prohibited the state from requiring a small class of persons—parents of adults who were involuntarily confined in state mental institutions—to pay the public expense of a patient's confinement. Relying on *Department of Mental Hygiene* v. *Hawley* (1963) 59 Cal.2d 247 [28 Cal.Rptr. 718, 379 P.2d 22], in which we had recently reached a similar conclusion on either due process or equal protection grounds, we held " '[t]he enactment and administration of laws providing for sequestration and treatment of persons in appropriate state institutions—subject of course, to the constitutional guaranties—who would endanger themselves or others if at large is a proper state function; being so, it follows that the expense of providing, operating and maintaining such institutions should . . . be borne by the state' " (*id.*, at pp. 719-720), and that recovery could not constitutionally be had against the father of the committed patient. "This holding [in *Hawley*] is dispositive of the issue before us. Whether the commitment is incidental to an alleged violation of a penal statute, as in *Hawley*, or is essentially a civil commitment as in the instant case, the purposes of confinement and treatment or care in either case encompass the

---

frustrate rather than further the goal of the ordinance: Landlords concerned with securing optimal rent increases may be reluctant to rent to those who would be able to trigger consideration of the hardship provision, or to purchase housing that would likely be rented to low income persons, thus making affordable housing for such persons even more scarce. This, however, does not make the classification constitutionally infirm, but merely illustrates the oft-noted principle that under the rational basis test we inquire only whether the classification is in any way rational, not whether it is wise.

[8]Defendant suggests we "indirectly" approved a similar hardship provision in *Nash* v. *City of Santa Monica* (1984) 37 Cal.3d 97, 101, footnote 3 [207 Cal.Rptr. 285, 688 P.2d 894]. As defendant concedes, however, the issue was not in any way discussed in that case.

protection of society from the confined person, and his own protection and possible reclamation as a productive member of the body politic. Hence the cost of maintaining the state institution, including provision of adequate care for its inmates, cannot be arbitrarily charged to one class in the society; such assessment violates the equal protection clause." (*Id.*, at p. 720.) We recognized that a statute requiring such payments was in effect a form of taxation, and that "[a] statute obviously violates the equal protection clause if it selects one particular class of persons for a species of taxation and no rational basis supports such classification. [Citations.] Such a concept for the state's taking of a free man's property manifestly denies him equal protection of the law." (*Id.*, at pp. 722-723.)

Although *Kirchner*'s principles have been applied in various "responsible relative" reimbursement cases (see, e.g., *In re Jerald C.* (1984) 36 Cal.3d 1, 10 [201 Cal.Rptr. 342, 678 P.2d 917] (plur. opn.) (and cases there cited)), we have not applied "*Kirchner* analysis" outside that context. In this regard, there is no authority suggesting *Kirchner* prohibits rent control generally, or that it prohibits the present tenant hardship scheme specifically. We have often confirmed the propriety of local rent control legislation that in effect placed the burden of "subsidizing" tenants (to the extent of the difference between unregulated market rents and regulated "fair return" rents) not on the local government but on local landlords. (E.g., *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129 [130 Cal.Rptr. 465, 550 P.2d 1001]; *Carson Mobilehome Park Owners' Assn.* v. *City of Carson* (1983) 35 Cal.3d 184 [197 Cal.Rptr. 284, 672 P.2d 1297]; *Fisher, supra,* 37 Cal.3d 644.) As the United States Supreme Court recently held, "the function of government may often be to tamper with free markets, correcting their failures and aiding their victims," and rent control is an example of one such function. (*Fisher* v. *City of Berkeley, supra,* 475 U.S. 260, — [89 L.Ed.2d 206, 211].)

The possibility that local governments could accomplish the same result through a subsidy from general tax revenues has never been considered a bar to the validity of such legislation (on equal protection or any other ground) and we see no reason why such a possibility should operate to invalidate the limited reliance on economic hardship that is part of the ordinance under consideration here.[9] Indeed, this ordinance appears more

---

[9] For similar reasons we reject plaintiffs' claim that a New Jersey case, *Prop. Owners Ass'n, Etc.* v. *Tp. of No. Bergen* (1977) 74 N.J. 327 [378 A.2d 25, 5 A.L.R.4th 908], compels a ruling in their favor. *Bergen* involved a city rent control ordinance that provided a 15 percent annual rent increase for all units except those occupied by certain low income senior citizens. For such senior tenants the ordinance authorized no rent increase, but instead allowed the landlord to apply to the city for a subsidy, to be paid from public funds, to cover 10 percent over a qualified senior's frozen rent. The *Bergen* majority held the ordi-

finely tailored to local needs than "across-the-board" rent control: while granting a generous 8 percent automatic increase to all landlords, it offers the potential for even more liberal increases to those whose tenants can bear the additional increase without financial hardship. At the same time, and consistent with the ordinance's stated purpose, it provides that the additional rent increase may be denied if doing otherwise would pose a financial hardship to a particular tenant.

Plaintiffs next suggest the ordinance violates equal protection by its disparate treatment of those landlords with, and those without, hardship tenants. But as noted in *Cotati Alliance for Better Housing* v. *City of Cotati* (1983) 148 Cal.App.3d 280 [195 Cal.Rptr. 825], equal protection is not denied simply because some landlords may receive rents different (albeit nonconfiscatory) from those received by other landlords with similarly situated apartments *as long as there exists a rational basis for the distinction.* (*Id.*, at p. 291.)

Plaintiffs suggest nothing to convince us that the city's selection of those landlords with hardship tenants (as opposed to all landlords) to bear the burden of "subsidizing" hardship tenants is without any rational basis. Certainly a city could constitutionally elect to regulate only the rents charged for low- and medium-priced apartments and could decline to regulate, or

nance unconstitutional not because it allegedly placed on private persons a public burden, and not because it allegedly violated equal protection, but because it lacked a provision permitting a landlord to secure a subsidy over 10 percent if such an amount was necessary to avoid confiscatory results. (378 A.2d at pp. 27, 29-30.) It followed, the court reasoned, that "[u]nder the terms of the ordinance, [a] landlord may not recoup any additional funds to which he is rightfully entitled. Imposition of that burden would deprive an owner of property without due compensation. Such rent control is confiscatory and unconstitutional." (*Ibid.*) Although the *Bergen* opinion contains dicta suggesting the ordinance there improperly placed on private persons an exclusively public burden (*id.*, at pp. 27-28), and that it also suffered from various equal protection problems (*id.*, at p. 30; but see Pashman, J., dis. at pp. 32-34), the opinion clearly does not rely on the former and expressly declines to rely on the latter, and hence does not stand for the proposition asserted by plaintiffs.

The New Jersey Supreme Court has applied *Bergen* to invalidate—on due process "confiscatory" grounds—a rent control ordinance limiting rent increases for senior tenants to 80 percent of the formulate rate. (*Helmsley* v. *Borough of Fort Lee* (1978) 78 N.J. 200 [394 A.2d 65, 84].) The appellate division of the superior court, applying *Bergen*, has upheld a building permit condition requiring a developer to provide 10 percent of his 1,530 housing units to low income persons, and another 10 percent to moderate income persons. (*In re Egg Harbor Associates* (1982) 185 N.J.Super. 507 [449 A.2d 1324, 1333-1334], affd. *sub nom. Matter of Egg Harbor Assoc.* (*Bayshore Center*) (1983) 94 N.J. 358 [464 A.2d 1115].) The *Egg Harbor* court found the requirement "rationally related to the benefits and burdens created by the project itself" (449 A.2d at p. 1333), and concluded *Bergen* allows for "mandated subsidization by a property owner . . . 'as long as it is not excessive.'" (*Id.*, at p. 1334, quoting *Matter of Review of Health Care Admin.* (1980) 83 N.J. 67 [415 A.2d 1147, 1155].) Finally, the New Jersey Supreme Court has held that *Bergen* does not invalidate municipal ordinances requiring developers to set aside a portion of a development for low income housing. (*So. Burlington Cty. N.A.A.C.P.* v. *Mt. Laurel Tp.* (1983) 92 N.J. 158 [456 A.2d 390, 446, fn. 30].)

choose to regulate only minimally, the rents of high-priced units. The purpose of a so-structured regulatory scheme would be to assist only those who need assistance; the assumption underlying such a scheme would be that financially needy tenants reside in low- and medium-priced units and not in high-priced units. The present ordinance addresses the same purpose in a more precise fashion by differentiating between hardship and nonhardship tenants, through the rational means of distinguishing between their respective landlords. As noted in *Cotati Alliance, supra,* "[c]ourts consistently defer to legislative determinations as to the desirability of such distinctions." *(Id.,* at pp. 291-292.) We see no reason to depart from that settled rule here.

Although we might be inclined to hold such a scheme unconstitutional if the disparity in approved rents among landlords with and without hardship tenants was shown to be so great as to be characterized as arbitrary or grossly unfair, no basis for such a conclusion appears at this stage of the litigation. Again, under this ordinance *all* landlords are *guaranteed* a generous 8 percent rental increase each year as a matter of right, *regardless* of the hardship thereby imposed on any individual tenant. We cannot know the extent to which the tenant hardship factor, if triggered, might in practice reduce an affected landlord's otherwise allowable rental increase, and might consequently create a disparity that could be characterized as arbitrary or grossly unfair. Such an attack on the ordinance's tenant hardship provisions must await a challenge to the ordinance as applied to a particular landlord and a particular tenant.

## 2. *Plaintiffs' Cross-appeal*

■ California Constitution, article XIII A, section 4, enacted in June 1978 as part of Proposition 13, provides that "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose *special taxes* on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district." (Italics added.) Plaintiffs claim the $3.75 per year rental unit fee imposed under the ordinance[10] is a "special

---

[10]Section 5704.1 of the ordinance provides: "Fees. The costs of providing and administering the San Jose Rental Dispute Mediation and Arbitration Hearing Process shall be reimbursed to the General Fund by imposition of a fee chargeable against each rental unit in the City of San Jose subject to the provisions of this Chapter."

Section 5704.2 of the ordinance provides: "Amount of Fee. There is hereby imposed on each rental unit, subject to the provisions of this Chapter, a fee of three dollars and seventy-five cents ($3.75) per year which shall be paid annually at the time at which the landlord's business license fee under Article VI or Article XII of this Code is due. Said fee is includable as a cost of maintenance and operation under the definition contained in Section 5702.4. The City Manager and the Commission shall report to the Council in time for budget hearings each year their recommendation as to the amount of such fee necessary to recover the costs of the Hearing Process."

tax" that cannot be imposed absent a two-thirds majority of the city's voters. The city, on the other hand, insists the charge is merely a regulatory fee and hence not subject to the constitutional provision. As noted (*ante,* fn. 10), the ordinance's rental unit fee is to be paid on each rental unit and is designed to defray the costs of providing and administering the hearing process prescribed in the ordinance, not to pay general revenue to the local government. The relatively minor unit fee imposed here does not "exceed the sum reasonably necessary to cover the costs of the regulatory purpose sought." (*United Business Com.* v. *City of San Diego* (1979) 91 Cal.App.3d 156, 165 [154 Cal.Rptr. 263].) The rental unit change is clearly a regulatory fee. (See *City & County of San Francisco* v. *Boss* (1948) 83 Cal.App.2d 445, 450-451 [189 P.2d 32].)

We agree with *Mills* v. *County of Trinity* (1980) 108 Cal.App.3d 656 [166 Cal.Rptr. 674], which, in a similar situation, concluded that "the 'special tax' referred to in section 4 of article XIII A does not embrace fees charged in connection with regulatory activities which fees do not exceed the reasonable cost of providing services necessary to the activity for which the fee is charged and which are not levied for unrelated revenue purposes." (*Id.,* at pp. 659-660; see also, *id.,* at pp. 662-663, discussing the Legislature's interpretation of "special taxes" in Gov. Code, § 50076; *United Business Com., supra,* 91 Cal.App.3d at pp. 164-167; *County of Plumas* v. *Wheeler* (1906) 149 Cal. 758, 764.) Accordingly, the trial court properly upheld the ordinance's rental unit fee provision.[11]

The judgment is reversed insofar as it declares the tenant hardship provisions facially unconstitutional. In all other respects the judgment is affirmed.

Bird, C. J., Broussard, J., and Reynoso, J., concurred.

**MOSK, J.**—I dissent.

Satisfying the housing needs of persons in lower economic strata is necessary, but the issue is whether that obligation can be thrust upon private property owners rather than remain a responsibility of society as a whole through tax-supported government agencies. The majority have selected an

---

[11]Contrary to plaintiffs' view, the fact that landlords may not believe they "benefit" from the rental unit fee does not transform a regulatory fee into a "special tax." It is well settled that a municipality under the police power may impose a regulatory fee when, as here, the fee constitutes an amount necessary to carry out the purpose and provisions of the regulation. (*United Business Com., supra,* 91 Cal.App.3d at p. 165; accord, *Mills, supra,* 108 Cal.App.3d at pp. 659-660; 9 McQuillin, Municipal Corporations (3d ed. 1978) § 26.15, p. 29.)

alternative they concede is unprecedented—no other city ordinance has been so written and no California case has approved a comparable technique—and I am convinced this scheme is unconstitutional.

The ordinance exhibits constitutional infirmity on its face. While the ordinance allows both automatic and cost-related increases to the *landlord* (§§ 5703.2, 5703.5, 5703.28, subds. (a) & (b)), section 5703.28, subdivision (c)(6), makes the additional rent increase dependent on the *tenant's* financial hardship. (§ 5703.29.) This criterion is entirely arbitrary and unjustifiable; indeed, it runs counter to a legitimate purpose of rent control regulation, i.e., assurance of a fair and reasonable return on the owner's investment.

As the majority themselves point out, tenant hardship is given potentially overriding weight under the ordinance. Thus, tenants qualifying under certain federal standards—a large category made up of all families in San Jose whose income is less than 80 percent of the median—are "deemed" to suffer economic hardship "which must be weighed" in the hearing officer's determination. (*Ibid.*) Giving meaningful weight to that factor necessarily results in depriving landlords of what the hearing officer would otherwise calculate as a reasonable return, based on the particular rental history of the unit, its condition, housing services provided, financial information such as debt service, and existing market value for comparable units. (§ 5703.28, subd. (c)(1)-(5).)

The majority simply beg the question when they treat the portion of the rental determination that subdivision (c) might permit as in effect a bonus for landlords with nonhardship tenants. It is true that such rents exceed those permissible as a matter of right under the other provisions of the ordinance. (§ 5703.28, subds. (a) & (b); § 5703.2.) Nevertheless, the hearing officer is required by the clear language of the provision to determine if a rental increase is "reasonable under the circumstances," not to authorize the receipt of more rents than a landlord is due. If a proposed rent is truly in excess of his due, it will be unreasonable by definition. Indeed, the stated purpose of the section is to provide a means by which a landlord can receive a fair return on his particular unit when the increases permissible by right are deficient, inadequate and therefore "[*un*]*reasonable under the circumstances.*"

Simply on the basis of the hardship status of his tenant, one landlord will receive a significantly lower rent than another landlord in *identical* circumstances if the latter merely had the good fortune of renting to a nonhardship tenant. That disparity is untenable when it means that the former landlord is deprived of the reasonable return on his property to which he would

otherwise be entitled. Such uneven treatment amounts to a forced subsidy imposed on the landlord in violation of the due process clauses of the United States and California Constitutions, which prohibit the taking of property without just compensation. (See *Prop. Owners Ass'n, Etc.* v. *Tp. of No. Bergen* (1977) 74 N.J. 327 [378 A.2d 25, 29, 5 A.L.R.4th 908].)

Moreover, although we have repeatedly upheld rent control ordinances that apply to landlords as a class, this measure goes a critical step further by requiring individual landlords to reduce rentals for individual tenants with financial hardship. There is no rational link, either in the benefit gained or the burden created, which would justify imposing that welfare obligation as a one-on-one subsidy, rather than spreading the imposition fairly through the class of landlords generally or taxpayers as a whole.

The majority discount the obvious analogy to our reasoning in *Dept. of Mental Hygiene* v. *Kirchner* (1964) 60 Cal.2d 716 [36 Cal.Rptr. 488, 388 P.2d 720, 20 A.L.R.3d 353], because we have not previously extended that case explicitly to rent control matters. I believe, on the contrary, that *Kirchner* is on all fours with the unusual circumstances of this case: a small class of persons, here landlords of hardship tenants, are required to shoulder what is essentially a public burden, in this case the social necessity of easing the plight of economically depressed citizens. Such a subsidy—like the requirement in *Kirchner* that relatives of persons committed involuntarily to mental institutions pay the costs of treatment—amounts to involuntary taxation. As we held in *Kirchner,* "A statute obviously violates the equal protection clause if it selects one particular class of persons for a species of taxation and no rational basis supports such classification." (*Id.* at p. 722.)

The tragic aspect of the provision is that it will likely prove detrimental to the very interests it seeks to protect. Landlords, who will have a great deal to lose by renting to economically marginal tenants, hereafter will carefully screen potential tenants to assure themselves of remaining entitled to a fair return on their properties. It is ironic that in upholding this unconstitutional ordinance the majority accede to a counterproductive result.

Lucas, J., and Saldamando (Alexander E.), J.,* concurred.

---

*Judge, San Francisco Municipal Court, assigned by the Chairperson of the Judicial Council.