[No. C000386. Third Dist. May 30, 1989.]

TAHOE-SIERRA PRESERVATION COUNCIL et al., Plaintiffs and Appellants, v.
STATE WATER RESOURCES CONTROL BOARD et al.,
Defendants and Respondents.

1422

COUNSEL

Ronald A. Zumbrun, Robin L. Rivett and Fred A. Slimp II for Plaintiffs and Appellants.

John K. Van de Kamp, Attorney General, Robert H. Connett, Assistant Attorney General, and Edna Walz, Deputy Attorney General, for Defendants and Respondents.

## OPINION

**BLEASE, J.**—This appeal concerns the lawfulness of measures adopted by the State Water Resources Control Board (Water Board) to prevent increased surface runoff of water carrying soil products into Lake Tahoe, caused by the increased land coverage of new development, from turning the lake from clear blue to turbid brown. The Lake Tahoe Basin Water Quality Plan (Plan) establishes standards which have the effect of limiting the amounts of land coverage by roads, buildings and the like, in designated areas within the basin. New development which exceeds land coverage standards in the Plan requires a permit from a regional board charged with the responsibility of enforcing the Plan.

Tahoe-Sierra Preservation Council, a nonprofit corporation, and eight owners of lots in the Lake Tahoe basin (plaintiffs) seek to invalidate the Plan as exceeding the statutory and constitutional authority of the Water Board. Plaintiffs contend that the trial court erred in granting judgment on the pleadings in their action for declaratory and injunctive relief. We hold that the Plan does not exceed the Water Board's statutory and constitutional authority to employ a permit system to enforce the Plan and conclude that the claims of unconstitutional taking are not ripe.

We will affirm the judgment with modifications.

### INTRODUCTION

The plaintiffs first challenge the validity of the enforcement mechanism employed in the Plan, a permit system adopted pursuant to the waste discharge requirements provisions of the Water Code. (Wat. Code, §§ 13260-13273.)[1] We hereafter refer to this enforcement mechanism as the state permit system or waste discharge permit system. ■ ■ ■ ■ Plaintiffs claim that the Water Board lacks statutory authority to adopt a water quality control plan which enforces limits on "*non*point" sources of pollution, as here,[2] by means of such a state permit system.

---

[1] All further unspecified references to sections are to the Water Code.

[2] Nonpoint sources are defined by obverse inference from the definition of point sources of water pollution, generally sources of pollution directly attributable to a specific property or project or action. A point source is defined under the Federal Water Pollution Control Act as a " 'discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged.' " (33 U.S.C. § 1362(14)); see *EPA* v. *State Water Resources Control Board* (1976) 426 U.S. 200, 204 [48 L.Ed.2d 578, 583, 96 S.Ct. 2022].) So viewed, we assume for purposes of this case that impervious surface coverage is a nonpoint source of the pollutants entering Lake Tahoe.

The challenge to the permit system implicates the scope of the Water Board's authority, under section 13170, to "adopt water quality control plans . . . for waters for which water quality standards are required by the Federal Water Pollution Control Act . . . ." (FWPCA.) Plaintiffs argue that this authority is limited by the constraint they derive from federal law that a federal permit may not be used to regulate the *non*point sources of pollution of waters subject to the FWPCA. As we show, the argument fails because the restrictions of the federal system do not limit the state's enforcement authority and hence are not applicable to the Plan.

Alternatively, plaintiffs claim that the Plan violates section 13360, which prohibits the Water Board from specifying the particular manner of compliance with the state permit system. The Plan precludes water runoff above that which could occur under the permitted limitations on land coverage. As we shall explain, the Plan does not preclude any means of compliance with this runoff limitation and hence does not improperly specify the particular manner of compliance.

Plaintiffs also claim the Plan is unconstitutional. They first claim that the Plan's coverage standards deny them procedural due process of law. They argue that the waste discharge standards must be stated in terms of quantities of identified materials that may be discharged from their property; that since the Plan regulates the sources of pollution by restricting land coverages they are deprived of a fair opportunity to prove that they can develop their lands in excess of the permitted coverage without adversely affecting the water quality of the lake. The challenge fails for the reason that plaintiffs are afforded an adequate opportunity under the Plan to show compliance with the substantive runoff standard and that is all the process which they are due. Plaintiffs' alternative casting of the perceived defect, as a prohibited conclusive presumption—that the land classification conclusively determines the permitted amount of discharge—fails for the same reason. The Plan does not rule out any mode of evidence that plaintiffs might adduce to establish compliance by their proposed development with the substantive rule of discharge.

Plaintiffs then claim that the Plan amounts to an unconstitutional regulatory taking of their property without just compensation. We shall conclude that the claim is not ripe.

### FACTS AND PROCEDURAL BACKGROUND

The appeal arises from a judgment on the pleadings. For that reason, the factual assertions material to the resolution of the appeal are derived from

the pleadings and matters which were judicially noticed by the trial court or are so noticeable by this court. The following claims of fact are derived from plaintiffs' complaint, the Plan as amended which is incorporated therein, and a Plan amendment adopted in January 1983 which was put before the trial court by the Water Board's motion for judicial notice.

Lake Tahoe is extraordinarily clear and pure. It is possible to see to depths of over 120 feet. Extremely low rates of growth of algae in the lake impart a deep blue color, unsurpassed by any lake in the world. Geology, soils, vegetation, and human activities profoundly influence the rate of nutrient input to the waters of the Lake Tahoe basin and thus determine the quality of the lake and its tributaries. Rapid development in the basin over the past two decades is causing a deterioration of the water quality of the lake. Over the past 20 years, the rate of algal growth in the lake has doubled. The algal growth rate is increasing at an accelerating rate. Evidence indicates that the lake's exceptional water clarity has diminished within the last decade. If the trend continues, the lake's translucent blue color will be altered.

The surface runoff of water carrying soil products into the lake is the principal source of pollutants which induce the growth of algae in the lake. Water runoff breaks down basin soils and transports erosion products to the lake. These erosion products include soil particles, which cause turbidity and sedimentation, and nutrients, which stimulate algal growth. Under natural conditions, surface runoff of water entering Lake Tahoe contains extremely low concentrations of suspended sediment and nutrients. The natural balance, however, is easily upset.

Development in the basin has greatly upset the natural balance by the increased generation of sediment and nutrients. This occurs because development removes the vegetative cover decreasing the infiltration of water into the soil by precipitation, thereby increasing the runoff of water and the accompanying soils. Erosion rates dramatically increase and the uptake of nutrients by vegetative cover decreases when the cover is removed. Development increases impervious surface area, i.e. area impervious to the penetration and infiltration of water. The construction of structures, paved areas, and other impervious surfaces decreases infiltration of water and greatly increases surface runoff of water. Natural channels downstream of paved areas experience increased runoff rates and erosion. Finally, development creates unstable conditions. Areas stripped of vegetative cover are left bare. Cut and fill slopes often are steeper than the natural angle of repose and have no surface protection. Stream environment zones are overloaded by

increased runoff and sediment loads. Construction and filling within stream environment zones convert slow sheet flow into channelized flow.

The need for water quality standards and water quality planning to protect Lake Tahoe has long been recognized. In 1966, the Federal Water Pollution Control Administration (now the Environmental Protection Agency) convened the Conference of the Matter of Pollution of the Interstate Waters of Lake Tahoe and Its Tributaries. The conference found that sewage disposal and erosion caused by development within the basin threatened the water quality of the lake. The conference recommended adoption of more stringent water quality standards, export of all wastewater and solid waste from the basin, and enforcement of tighter controls over development. Shortly after the conference the California Regional Water Quality Control Board, Lahontan Region, adopted a water quality control policy. Nevada adopted standards in 1967.

The primary objective of the policy adopted by the Lahontan Regional Board was "to maintain the waters of Lake Tahoe in their present natural state of crystal clarity and pristine purity." The policy prohibited the discharge of sewage or solid waste to surface waters in the Lake Tahoe basin. It also called for control of erosion and urban runoff. Various measures were undertaken to abate problems attributable to sewage and solid waste. These efforts have been successful in large part.

The principal remaining threat to Lake Tahoe is erosion. In 1970 the Lahontan Regional Board adopted the addendum to the Lake Tahoe water quality control policy regarding control of siltation. The addendum prohibits the discharge of earthen materials to surface waters. Any activity causing erosion which adds silt to Lake Tahoe or its tributaries violates the prohibition. The addendum also prohibits the deposit of any earthen material below the high water mark of the lake or within the 100-year flood plain of any stream. Nevada adopted similar standards in 1973.

A system developed by the forest service in 1971, in cooperation with the Tahoe Regional Planning Agency (TRPA), provides a relative quantification of tolerance of land in the basin to human disturbance. The classification system provides allowable percentages of impervious cover and is set out in Bailey, Land Capability Classification of the Lake Tahoe Basin, California-Nevada (1974). (Hereafter Bailey system.) Factors evaluated under the Bailey system in determining an area's land capability include the hazards from floods, high water tables, poorly drained soils, landslides, fragile flora and fauna, soil erodibility, and slope steepness. All of these factors affect sediment generation from an area following disturbance.

Lands in the basin are grouped into three general risk categories, high, moderate, and low, representing the hazard of disturbance from development. The Bailey system was made the basis of coverage standards adopted by the TRPA and the California TRPA.

In July 1978 the Water Board, dissatisfied with efforts of the TRPA to establish controls and enforcement mechanisms that would abate the persistent water quality problems caused by erosion resolved to prepare its own plan. The Plan was released in draft form in January 1980. It was adopted by the Water Board on October 29, 1980. The Plan incorporates the Bailey system. It prohibits discharge of waste attributable to new development in stream environmental zones or new development which is not in accordance with the classification system. The Plan was drafted to satisfy California's obligations for an areawide waste treatment plan under the FWPCA. However, the Plan was also independently grounded in the Water Board's authority under state law.

Soon after the Water Board adopted the Plan plaintiffs filed this action challenging its validity. The Water Board moved for judgment on the pleadings, which the trial court, in August 1982, granted in part and denied in part with leave to amend. The plaintiffs then filed their second amended complaint, which provides the grist for this appeal. In it plaintiffs allege, in material part, as follows:

The plaintiffs who are landowners purchased six lots in single family residence subdivisions, in areas subject to the Plan restrictions, respectively in 1960, 1975, 1975, 1978, 1978, and 1979. Two of them are in areas designated as stream environment zones, three are in areas designated as class 1 zones, and one is in an area designated as a class 3 zone. As a result of the restrictions in the Plan plaintiffs with lots in stream environment zones are precluded from constructing residences upon these lots. As a result of restrictions in the Plan combined with limitations of minimum coverage requirements imposed by *other* governmental regulations the other landowner plaintiffs are precluded from constructing residences.

The Water Board answered the second amended complaint and again moved for judgment on the pleadings. The trial court granted the motion as to all but two counts of the second amended complaint. The Water Board responded to the partial denial by promulgating an amendment to the Plan in January 1983 to explicitly state that landowners would be afforded an opportunity to prove that a proposed development exceeding the coverage limitations would *not* result in a discharge of sediment and nutrients greater than that which would occur if the coverage standard was met. The Water

Board then moved for judgment on the pleadings (with judicial notice of the Plan amendment) as to the outstanding counts. The motion was granted.

## DISCUSSION

### I

The Plan seeks to control the water quality of Lake Tahoe by limiting the introduction of sediment, nutrients and other soil products into the lake through water runoff by regulation of the amount of impervious surface coverage of land within the Lake Tahoe basin. It expressly provides for enforcement of the land coverage limitations by a permit system under the waste discharge requirements provisions of the Water Code (§§ 13260-13273).

■ Plaintiffs seek invalidation of the use of the state permit system and with it the entire Plan.[3] They argue that this means of enforcement may not be employed to regulate a *non*point source of pollution affecting the waters of Lake Tahoe, in which category they place impervious surfaces.[4] They claim that the Water Board's authority under section 13170 to enact a water quality control plan "required by" the FWPCA (33 U.S.C. § 1251) precludes the use of the state permit system to regulate *non*point sources of pollution. They reason that since under the federal act federal permits are not used for regulation of *non*point sources of pollution the state may *not* do so by resort to its own authority.

Plaintiffs principally rely upon section 13374 as the interpretive spring-board for this view. It provides that "The term 'waste discharge require-

---

[3] Plaintiffs do not address the question whether the enforcement mechanism of the Plan, the permit system, is an inseparable part of the Plan such as to require invalidation of the whole if the part is found defective. (Cf. *People's Advocate, Inc.* v. *Superior Court* (1986) 181 Cal.App.3d 316, 329-334 [226 Cal.Rptr. 640].) Rather, they assume that to be the case. The assumption is not viable. If plaintiffs' argument were persuasive this would not compel invalidation of the Plan. The Water Board in a water quality control plan within its jurisdiction may "specify certain conditions or areas where the discharge of waste, or certain types of waste, will not be permitted." (§ 13243.) Such discharge prohibitions may be enforced by cease and desist orders of the regional water quality control board. (See § 13303; Ayer, *Water Quality Control at Lake Tahoe: Dissertation on Grasshopper Soup* (1971) 1 Ecology L.Q. 40, fn. 245.) Since we find no flaw in the use of the waste discharge permit system we need not pursue this analysis.

[4] An initial difficulty with plaintiffs' claim that the Plan is invalid on this ground is that it is nowhere alleged in the plaintiffs' second amended complaint. Nonetheless, we consider the claim because it was presented in a plaintiffs' memorandum and was considered and rejected on its merits by the trial court. This action may have misled the plaintiffs into the otherwise insupportable belief that their pleading was adequate to tender the claim. Though we consider the claim, we do not approve this as a proper manner of pleading a cause of action.

ments' as referred to in this division is the equivalent of the term 'permits' as used in the Federal Water Pollution Control Act, as amended." Plaintiffs argue that this equation of the state with the federal permit system restricts the employment of the state permit system to the regulation of the point sources of pollution to which the federal permit system is limited. They reason that, because the state is carrying out a federal mandate, its authority must be limited in precisely the same way that the federal regulatory authority is limited. Plaintiffs do not comment on the inconsistent fact that the federal act *mandates* state regulation of *non*point sources by means of the state's choosing.

The Water Board replies that the equivalency contemplated by section 13374 "shall apply only to *actions required* [of the states] under the [FWPCA]" (§ 13372, italics added) and that the use of the state permit system to enforce limitations in the Plan on *non*point sources of pollution is not such an action. Simply put, the Water Board says that the state is free to regulate *non*point sources as it chooses, and it has chosen to do so by employment of the state's waste discharge permit system.

We agree with the Water Board. The flaw in plaintiffs' argument is that it requires that we read provisions of the Water Code, designed to ensure a limited conformity of state law with federal law, to *oust* the state of its *own* powers to control *non*point sources of water pollution. Such an implied repeal of existing regulatory authority is impermissible where unaccompanied, as here, by an express intention to accomplish that result. (See, e.g., *Fuentes* v. *Workers' Compensation Appeals Bd.* (1976) 16 Cal.3d 1, 7 [128 Cal.Rptr. 673, 547 P.2d 449]; *American Friends Service Committee* v. *Procunier* (1973) 33 Cal.App.3d 252, 260 [109 Cal.Rptr. 22].) We read section 13374 as requiring equivalency *only* for purposes of state compliance with the *minimum* requirements of the federal mandate. The federal law does not preclude the state from utilizing its broader authority to regulate nonpoint sources of pollution by means of its waste discharge permit system. In fact it mandates that some means of regulation under state law be applied to those sources. The proof of these conclusions requires an analysis of the history and structure of the material portions of the California water control law.

## A.

The Water Board's regulatory authority over the waters of Lake Tahoe derives from section 13170. It provides that the Water Board "may adopt water quality control plans . . . for waters for which water quality standards are required by the Federal Water Pollution Control Act . . . ." The section was enacted in 1971, the year before the enactment of section 13374,

the provision relied on by plaintiffs. (Stats. 1971, ch. 1288, § 6, p. 2524.) The provisions, of which section 13374 is a part, were enacted by the Legislature in 1972 as chapter 5.5 of division 7 of the Water Code. The announced purpose of this enactment was to ensure "consistency" of California's water quality control law with the FWPCA, as amended in 1972. (§ 13372; Stats. 1972, ch. 1256, eff. Dec. 19, 1972.)

Nothing in the enactment suggests that the Legislature meant thereby to oust the state of its regulatory authority, contained in division 7 of the Water Code, providing that it is consistent with federal law. On the contrary, section 13372 declares that "[t]o the extent other provisions of this division are consistent" with the new provisions those "provisions shall be applicable to actions and procedures provided for in this chapter." The consistency contemplated by this provision is measured by the purpose of the federal law to control water pollution in navigable waters. There is nothing in the federal act to suggest that a state may not provide for more stringent regulation. Indeed, as we will show, both federal and state law contemplate the opposite, *state* regulation of *non*point sources of pollution pursuant to *state* law. This brings us to the state law and its relation to the FWPCA.

#### B.

The Plan contemplates enforcement of its standards under sections of the Water Code which provide for issuance of waste discharge permits which prescribe the nature of proposed discharges, existing discharges, or material changes therein. (§ 13263.) A discharge or threat of discharge of waste in violation of requirements subjects the violator to civil penalties. (See § 13301 et seq.) Plaintiffs argue that this means of enforcement can only be used to regulate water pollution from activities that are "point sources" within the meaning of the FWPCA. As related, they principally rely upon section 13374.

Section 13374 must be viewed against the backdrop of the provisions of the Porter-Cologne Water Quality Control Act (Porter-Cologne Act), division 7 of the Water Code was enacted in 1969. (§ 13020.) The act assigns the governance of water quality to the Water Board and nine regional boards. (§§ 13050, 13200 et seq.) At the outset the Water Board was assigned authority to adopt water quality control plans for interstate or coastal waters or other waters of interregional or statewide interest. (Former § 13142, subd. (c); Stats. 1969, ch. 482, § 18, p. 1055.) The authority to adopt water quality control plans carries with it the authority to employ the waste discharge permit system as a means of enforcement set forth in division 7 of the Water Code. That is so because a water quality control

plan consists of a statement of: "(1) beneficial uses to be protected, (2) water quality objectives, and (3) a program of implementation needed for achieving water quality objectives." (§ 13050, subd. (j).) The program of implementation contemplates employment of the various remedial devices set forth in division 7 of the Water Code.

In 1971 the Porter-Cologne Act was amended and the provision assigning the Water Board responsibility for interstate, coastal, interregional, and statewide interest waters was deleted. (Stats. 1971, ch. 1288, § 2, p. 2523.) In its place section 13170 was enacted which says the Water Board may adopt water quality control plans "for waters for which water quality standards are required by the Federal Water Pollution Control Act and acts amendatory thereof or supplementary thereto." (Stats. 1971, ch.1288, § 6, p. 2524, fn. omitted.) Upon adoption such plans supersede regional plans to the extent of any conflict. (*Ibid.*)

The Water Board asserts that the Plan is a water quality control plan adopted under section 13170.[5] Under the Porter-Cologne Act a water quality control plan may specify certain conditions or areas where the discharge of waste, or certain types of waste will not be permitted. (§ 13243; also see § 13170.) Anyone who discharges or proposes to discharge waste must file a report with the appropriate regional board. (§ 13260.) The regional board may waive this requirement where waiver is not against the public interest. (§ 13269.) The regional board implements the water quality control plans by prescribing requirements for particular discharges. (§ 13263.)

## C.

In October 1972 Congress enacted Public Law number 92-500, an extensive amendment, reorganization, and expansion of the FWPCA. (A succinct discussion of the purposes and effect of the enactment is provided in *EPA* v. *State Water Resources Control Board, supra,* 426 U.S. 200 [48 L.Ed.2d 578], hereafter *EPA* v. *Water Board*.) Under the prior law, states had only been required to develop standards for interstate navigable waters. *The means of enforcement were left to the states.* (See Sen.Rep. No. 92-414 [hereafter Senate Report], as reprinted in 1972 U.S. Code Cong. & Admin. News, at pp. 3668-3669.) Under the 1972 amendments states are required to

---

[5] Plaintiffs' opening brief characterizes the Plan as a 208 plan under the FWPCA and claims that the Water Board is without authority to adopt such a plan. The argument leads down a blind alley. Plaintiffs concede that the Plan was submitted to EPA as a 303 plan under 33 United States Code section 1313. Since the Water Board's authority under section 13170 extends to a 303 plan, the 208 plan argument is a meaningless excursion. Neither party addresses the relationship under the FWPCA of the two types of plans, nor is such a discussion to be found in the FWPCA or secondary materials we have reviewed.

develop standards for all navigable waters including intrastate navigable waters. (See 33 U.S.C. § 1313(a).) Additionally, states are required to prepare and establish an inventory of publicly owned freshwater lakes and adopt procedures to control sources of pollution in such lakes. (33 U.S.C. § 1324.)

The 1972 enactment made other significant changes in the FWPCA system. Congress was apparently dissatisfied with the pace of correction under the prior regime in which the means of enforcement of water quality standards was unspecified and left to the states to develop without a structured federal procedure. (See Stewart & Krier, Environmental Law and Policy (1978) pp. 505-510.) To remedy this defect the 1972 enactment provides for direct restrictions on discharges of pollution by establishment of "effluent limitations" (restrictions on constituents which are discharged to navigable waters from any point source, 33 U.S.C. § 1362(11)) for "point sources." (33 U.S.C. § 1342.) Effluent limitations on point sources of pollution are enforced by a permit system, the National Pollution Discharge Elimination System (NPDES). (*Ibid.*)

The FWPCA provides that states with appropriate regulatory systems may administer the NPDES. (See Sen.Rep., U.S. Code Cong. & Admin. News, *supra,* p. 3675; 33 U.S.C. § 1342.) It also retains the earlier federal law which requires that nonpoint sources of water pollution *must* be identified in areawide waste treatment management plans developed by state or regional entities and controlled to the extent feasible by (unspecified) means available to state and local authorities. (33 U.S.C. § 1288.) States thus are not only free to adopt but are *mandated* to adopt and enforce standards with enforcement mechanisms derived from state law. (33 U.S.C. § 1370.)

### D.

In response to the FWPCA California replaced former section 13142, subdivision (c), with section 131270. In response to the 1972 amendment of the FWPCA California added chapter 5.5 to division 7 of the Water Code. The purpose of this amendment is set out in the urgency clause: "The Federal Water Pollution Control Act as amended in 1972 requires the state to have certain powers in order to continue to regulate waste discharges to navigable waters of the United States. The powers contained in this act will allow the State Water Resources Control Board and the regional water quality control boards to comply with federal requirements and continue to regulate waste discharges." (Stats. 1972, ch. 1256, § 3, p. 2490.) Section 13374, upon which plaintiffs' argument hinges, was enacted as part of this amendment. As related, it says that "waste discharge requirements" as

referred to in division 7 is the "equivalent" of "permits" as used in the FWPCA.

The federal permit system, NPDES, applies only to point sources of pollution. (33 U.S.C. §§ 1311(a), 1362(12); see *National Wildlife Federation v. Gorsuch* (D.C. Cir. 1982) 693 F.2d 156, 164-165 [693 F.2d 156].) As the Water Board notes, the waste discharge permit system long predates the NPDES and has been employed to regulate water pollution regardless of its origin in a point or nonpoint source under the authority of state law. (See, e.g., 63 Ops.Cal.Atty.Gen. 51 (1980).) This usage was expressly endorsed by the Legislature in the enactment of the Porter-Cologne Act. (See Stats. 1969, ch. 482, § 36; 63 Ops.Cal.Atty.Gen. at pp. 56-57.) It is reflected in the organization of regulations of the Water Board which contain separate articles addressed to procedures for waste discharge requirements pertaining to discharges from point sources to navigable waters and to discharges other than from point sources to navigable waters. (23 Cal. Code Regs., subchapter 9, arts. 2 and 3.)

### E.

That brings us back to the provisions of section 13374. It provides: "The term 'waste discharge requirements' as referred to in this division is the equivalent of the term 'permits' as used in the Federal Water Pollution Control Act, as amended."

Plaintiffs concede that prior to enactment of section 13374 the Water Board was free to enforce water pollution standards implicated by discharges from nonpoint sources by means of waste discharge requirements under section 13263. Moreover, they assert that this means may be used to enforce water pollution standards implicated by nonpoint sources if the water being polluted is *not* a body for which standards are mandated by the FWPCA. However, they read section 13374 as a voluntary relinquishment of state power to use the waste discharge permit system with respect to nonpoint sources of pollution implicating water quality standards in waters subject to the FWPCA. Plaintiffs suggest no persuasive reason for such a selective relinquishment of authority to achieve water quality standards. There is nothing in the history or provisions of the statutory system of water pollution control to suggest such an intention. It is not to be drawn from the provisions of section 13374, to which we will turn for detailed analysis.

In section 13000 the Legislature set out various findings at the time of enactment of the Porter-Cologne Act. One of these findings is "that the state must be prepared to exercise its full power and jurisdiction to protect

the quality of waters in the state from degradation originating inside or outside the boundaries of the state . . . ." (*Ibid.*) It is unnatural to read a relinquishment of state power and jurisdiction into this act absent an unambiguous legislative direction.

The obvious purpose of the declaration of equivalence in section 13374 between waste discharge requirements under the act and the term permits under the FWPCA is to qualify California to self-administer the NPDES. (See § 13370.) This is evident in the urgency clause of the enactment in which chapter 5.5 was contained. As related, "The [FWPCA] as amended in 1972 requires the state to have certain powers in order to continue to regulate waste discharges to navigable waters of the United States. The powers contained in this act will allow the [Water Board] and the regional water quality control boards to comply with federal requirements and continue to regulate waste discharges." (Stats. 1972, ch. 1256, § 3, p. 2490.) In order to qualify to administer the NPDES a state must meet various criteria concerning the kind of permits issuable under state law. (33 U.S.C. § 1344(h).) However, use of an identical permit system, under state law, to regulate nonpoint sources of pollution would not *disqualify* the state to self-administer the NPDES.

The function of section 13374 is to incorporate the federal criteria into the definition of waste discharge requirements. This purpose fully accounts for the meaning of "equivalent" in section 13374. To accomplish this purpose it is not necessary that section 13374 be read as a limitation on the ends to which state permits (waste discharge requirements) may be employed when *not* required under the NPDES. That is especially true since the FWPCA recognizes the problem of nonpoint sources of pollution but leaves it to the states to fashion suitable remedial devices. There is no federal constraint which requires a different system for state permits issued under NPDES and permits issued under state authority to regulate activities not subject to the NPDES. When we say A is the equivalent of B with respect to an end in view that does not entail the conclusion that A and B are identical with respect to other ends. Hence, the first answer to plaintiffs' interpretive claim is that equivalent does not mean identical with respect to restrictions not required by federal law.

F.

There are additional answers. As the Water Board notes, section 13372 qualifies the application of section 13374. Section 13372, as it now reads, says: "This chapter shall be construed to assure consistency with the requirements for state programs implementing the Federal Water Pollution Control Act and acts amendatory thereof or supplementary thereto. To the

extent other provisions of this division are consistent with the provisions of this chapter and with the requirements for state programs implementing the Federal Water Pollution Control Act and acts amendatory thereof or supplementary thereto, those provisions shall be applicable to actions and procedures provided for in this chapter. The provisions of this chapter shall prevail over other provisions of this division to the extent of any inconsistency. The provisions of this chapter shall apply only to actions required under the Federal Water Pollution Control Act and acts amendatory thereof or supplementary thereto. The provisions of this chapter relating to the discharge of dredged and fill material shall be applicable only to discharges for which the state has an approved permit program, in accordance with the provisions of the Federal Water Pollution Control Act, as amended, for the discharge of dredged and fill material." (Stats. 1987, ch. 1189, § 3.) Section 13372 and section 13374 must be read together and in the context of enactment of chapter 5.5 for the purpose of allowing California to administer the NPDES.

The Water Board suggests that "actions required under the [FWPCA]" in section 13372 only means actions pertaining to the administration of the NPDES (and any other federally required permit systems under the FWPCA.) This is consistent with the purpose of chapter 5.5. Plaintiffs' ultimate thesis is that the chapter is applicable to all "actions" taken under the FWPCA including all components of the adoption of water quality standards and implementation plans. Under their reading, section 13374 would preclude the state agency charged with adopting water quality standards and implementation plans under the FWPCA (33 U.S.C. § 1313) from continuing to use the state's permit system to regulate pollution from nonpoint sources as a part of its implementation plan.

Assuming for the sake of argument that the import of section 13372 is that chapter 5.5 is to apply to all actions required under the FWPCA,[6] plaintiffs' reading is nevertheless unpersuasive. It is inconsistent with the history of California's statutory program to regulate water pollution and the action is not "required by" the FWPCA. The federal law neither requires nor prohibits the control of pollution from nonpoint sources by means of a permit system. Accordingly, the employment of a permit system to regulate nonpoint source pollution in a plan implementing the federal law is not an "action[ ] *required* under the [FWPCA]." (§ 13372, italics added.)

---

[6] The Water Board notes that the direction that chapter 5.5 is applicable "only to actions required under the [FWPCA]" does not mean that the chapter is applicable to every action required under the FWPCA. Carefully read this only says that the chapter is inapplicable to actions not required under the FWPCA.

## II

■ Plaintiffs contend that the Plan is invalid because it conflicts with section 13360.[7] Section 13360 says that the Water Board may not prescribe the manner in which compliance may be achieved with a discharge standard. That is to say, the Water Board may identify the disease and command that it be cured but not dictate the cure. The Plan sets a discharge prohibition—no greater discharge than would occur if the coverage standard were met. It does not dictate the manner in which a landowner can meet the standard. This presents no violation of section 13360. Plaintiffs appear to argue that the Water Board has violated section 13360 because the Water Board expects that the only practical manner of complying with the discharge standard is to comply with the coverage restrictions. Plaintiffs' claim, boiled to its essence, is that if only one manner of meeting a discharge standard is feasible the Water Board may not prohibit the discharge. This contention is devoid of merit.

Section 13360 is a shield against unwarranted interference with the ingenuity of the party subject to a waste discharge requirement; it is not a sword precluding regulation of discharges of pollutants. It preserves the freedom of persons who are subject to a discharge standard to elect between available strategies to comply with that standard. That is all that it does. If, under present conditions of knowledge and technology, there is only one manner in which compliance may be achieved, that is of no moment. (*Pacific Water Conditioning Assn., Inc.* v. *City Council* (1977) 73 Cal.App.3d 546, 554 [140 Cal.Rptr. 812].) Where the lack of available alternatives is a constraint imposed by present technology and the laws of nature rather than a law of the Water Board specifying design, location, type of construction or particular manner of compliance, there is no violation of section 13360.

---

[7]Section 13360 said at the pertinent time: "No waste discharge requirement or other order of a regional board or the state board or decree of a court issued under this division shall specify the design, location, type of construction, or particular manner in which compliance may be had with that requirement, order, or decree, and the person so ordered shall be permitted to comply therewith in any lawful manner. However, regarding disposal sites other than evaporation ponds from which there is no drainage or seepage, the restrictions of this section shall not apply to waste discharge requirements or orders or decrees with respect to the discharge of solid waste requiring the installation of riprap, the construction of walls and dikes, the installation of surface and underground drainage facilities to prevent runoff from entering the disposal area or leakage to underground or surface waters, or other reasonable requirements to achieve the above or similar purposes. If the court, in an action for an injunction brought under this division, finds that the enforcement of an injunction restraining the discharger from discharging waste would be impracticable, the court may issue any order reasonable under the circumstances requiring specific measures to be undertaken by the discharger to comply with the discharge requirements, order or decree." (Stats. 1981, ch. 714, § 453, p. 2803.)

III

■ Plaintiffs contend that the Plan denies them procedural due process of law because the discharge prohibition is no greater discharge than would occur because of development within the permitted coverage restrictions. Plaintiffs argue that it is a denial of due process to fail to specify discharge in terms of quantities of materials. They argue that they are unfairly precluded from showing they can develop and nonetheless meet the Plan water quality standards because the coverage standard does not specify discharge in terms of quantities of materials. As appears, plaintiffs' real grievance is not that the form of the discharge prohibition is unfair but rather that the substance of the discharge prohibition may preclude a showing that a development with excess coverage is in compliance with the prohibition. We perceive no cognizable unfairness in the standard which undergirds the discharge prohibition.

The Water Board's discharge prohibition is an administrative rule. ■ An administrative rule, legislative in character, is subject to the same tests of validity as an act of the Legislature. (See *Knudsen Creamery Co.* v. *Brock* (1951) 37 Cal.2d 485, 494 [234 P.2d 26].) One who attacks such a rule has the burden of showing its unreasonableness. (E.g. *Freeman* v. *Contra Costa County Water Dist.* (1971) 18 Cal.App.3d 404, 408 [95 Cal.Rptr. 852].) A standard that has no content is no standard at all and is unreasonable. (See generally *Wheeler* v. *State Bd. of Forestry* (1983) 144 Cal.App.3d 522, 527-528 [192 Cal.Rptr. 693].) Plaintiffs claim that the discharge prohibition is unreasonable on this ground, but do not support it by persuasive reasoning or examples of the manner in which the prohibition is deficient.

■ Plaintiffs argue that they cannot show that a development exceeding the coverage restriction will not cause a prohibited discharge because the Plan does not tell them what a prohibited discharge is in terms of amounts of materials attributable to incremental runoff. Plaintiffs assert that they cannot compare the discharge attributable to a development with excess coverage with a permissible coverage development without a qualitative and quantitative analysis of a permissible discharge. They suggest that it is incumbent upon the Water Board to assert the quantities of materials that are permitted so that the landowner can prove that a proposed development exceeding the coverage restrictions would not generate an impermissible discharge. The argument is faintly reminiscent of the disingenuous request in Hansel and Gretel that Gretel be shown how to enter the oven.

We are given no reason why the classification system, incorporated in the Plan, and the provisions of the Plan do not afford a landowner sufficient

information concerning the causes and nature of the discharge of soil products into Lake Tahoe attributable to excess coverage of land to address the discharge prohibition. The factors causing discharge are listed in those materials. There is no indication that it is impossible to reason from those factors and the quantitative coverage standards contained in the land classification scheme to an adequate approximation of the permissible incremental runoff. To make the comparison called for by the discharge prohibition the landowner must show that in some fashion the incremental runoff caused by excess coverage will be contained and disposed of in a manner that will not give rise to increased discharge of sediment and nutrients into Lake Tahoe. If the landowner can show that additional runoff, attributable to the impervious surface coverage of his parcel, has been averted in some manner, this will satisfy the standard upon which discharge prohibition is predicated. We perceive no intrinsic unfairness in this kind of standard in light of the nature of the problem that is addressed by the Plan.

Plaintiffs' real complaint is that they know of no present, feasible technology that would enable them to develop in excess of the coverage restrictions and not cause incremental detrimental runoff. That problem, however, is one of substantive due process and not procedural due process. The plaintiffs have not pled such a claim and hence that question is not properly before us. Nonetheless, we note that nothing in plaintiffs' arguments poses a tenable substantive due process claim. To prevail on such a claim plaintiffs would have to establish that the discharge of pollutants attributable to added impervious surface is not rationally related to a legitimate state interest. (See *American Bank & Trust Co.* v. *Community Hospital* (1984) 36 Cal.3d 359, 368-369 [204 Cal.Rptr. 671, 683 P.2d 670, 41 A.L.R.4th 233].) On this record there is no lack of support for the conclusion by the Water Board that water runoff in excess of that attributable to the permitted coverage will cause increased erosion and increased transportation of sediment and nutrients into Lake Tahoe with a consequent increase in the turbidity and discoloration of the lake. It is incontestable that avoidance of this consequence is a legitimate state interest. (See *Morshead* v. *California Regional Water Quality Control Bd.* (1975) 45 Cal.App.3d 442, 449 [119 Cal.Rptr. 586].) Indeed, plaintiffs impliedly concede as much in their "taking" argument.

Plaintiffs' related attack on the form of the discharge standard is that it operates as a conclusive presumption. This attack is also unpersuasive. Plaintiffs argue that the discharge prohibition eliminates the means by which they might show that a proposed excess-coverage development will not in fact result in a prohibited discharge. They imply that the "elimination" of the opportunity is achieved by failure to state a discharge standard

in quantitative terms. But the discharge prohibition does not preclude plaintiffs from showing that, despite excess coverage, there is no prohibited discharge for a proposed development, as explained above. No mode of evidence to prove the ultimate fact of the absence of excess discharge is barred by the discharge prohibition. It does not operate as a conclusive presumption.

IV

Plaintiffs contend that the trial court erred in rejecting the claim that Plan is invalid because it amounts to a taking of their property without just compensation in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States and article I, section 19, of the California Constitution. Plaintiffs argue that the Plan restrictions constitute an unreasonably excessive regulation which rises to the level of a taking. Their second amended complaint seeks a declaration that: ". . . the absolute prohibitions against development in the Tahoe Plan are facially invalid and invalid *as applied* to plaintiffs' property because they preclude substantially all reasonable and beneficial use of plaintiffs' property, thereby constituting a taking of private property for public use without payment of just compensation . . . ." (Original italics.) Thus, two kinds of takings claims are proffered. The Water Board argues, inter alia, that these claims are not ripe for adjudication. This argument is persuasive and dispositive.[8]

The preliminary question is whether plaintiffs have tendered a triable takings claim that the Plan is invalid on its face. A claim that a regulation is *facially* invalid is only tenable if the terms of the regulation will not permit those who administer it to avoid an unconstitutional *application* to the complaining parties. (See, e.g., *Pennell* v. *City of San Jose* (1986) 42 Cal.3d 365 [228 Cal.Rptr. 726, 721 P.2d 1111]; *CSEA* v. *State of California* (1988) 199 Cal.App.3d 840, 846 [245 Cal.Rptr. 232]; 2 Longtin's Cal. Land Use

---

[8] The position of the Water Board on the merits is that there is no taking, even assuming as pled that the effect of the Plan is to preclude substantially all reasonable and beneficial use. The Water Board argues there is no "right" to use land in a manner that causes water pollution, such use is a public nuisance or similar to a public nuisance, and a prohibition of an activity does not count as a taking. This rationale was recently discussed in *Keystone Coal Assn.* v. *DeBenedictis* (1987) 480 U.S. 470, 491-494 [94 L.Ed.2d 472, 490-493, 107 S.Ct. 1232]. We entertained a similar defense in *Fallen Leaf Protection Assn.* v. *State of California* (1975) 46 Cal.App.3d 816.

The trial court accepted the Water Board's position on the merits. "[The Water Board] correctly point[s] out, however, that proscriptions on the taking of private property have not been applied so as to require government to pay for the abatement of the pollution of its waters or other forms of direct nuisance. [Citations omitted.] [¶] The bottom line is that the State of California does not have to pay people to keep them from turning Lake Tahoe brown." Because the claims here are not ripe we do not reach this issue.

(2d ed. 1987) §§ 12.04[5], 12.15[3], 12.30[3].) This restraint stems from the prudent judicial policy of avoiding officious checking of the political branches of the government. (See Tribe, American Constitutional Law (1988) § 3-10; cf., e.g., *Palermo* v. *Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 65-66 [195 P.2d 1]; *People* v. *Williams* (1976) 16 Cal.3d 663, 667 [128 Cal.Rptr. 888, 547 P.2d 1000].) ■ The question whether an alleged unconstitutional *application* of a regulation may be avoided is not governed by the conclusional allegations of the complaint. Rather, it turns upon the court's appraisal of the legal effect of the regulation. (See, e.g., *Agins* v. *Tiburon* (1980) 447 U.S. 255, 259, fn. 6 [65 L.Ed.2d 106, 111, 100 S.Ct. 2138].)

■ We will assume, for the sake of the present argument, that the Plan would count as a taking by overregulation if it were applied to preclude the construction of any residential structure on the parcels of the landowner plaintiffs. However, we cannot accept the conclusional assumptions of the plaintiffs concerning how the Plan would be applied to them. Specifically, we cannot accept as true the controverted allegations concerning how the parcels in issue would be characterized under the classification system of the Plan. Under the Plan each plaintiff is entitled to an administrative review of the applicability of the land coverage standards, established for the zone in which his parcel is located, and may show that the specific property does not share the characteristics of the standards by which the general classification is measured. (See *California Tahoe Regional Planning Agency* v. *Day & Night Electric, Inc.* (1985) 163 Cal.App.3d 898, 901 [210 Cal.Rptr. 48] [property classification altered from 1 percent to 24 percent coverage in an administrative review process].)

Until plaintiffs have sought a waste discharge requirement under the Plan from the responsible administrative authorities, it cannot be ascertained whether there is any potential taking in the application of the Plan to the "complaining parties" for it cannot be shown that the Plan has any effect on the beneficial use of the plaintiff's property. For the reasons that follow concerning the lack of ripeness of a claim that the Plan results in a taking as applied to the parcels in issue, plaintiffs are necessarily limited to an attack on the Plan as applied.[9] We note that this was the view of the trial court in

---

[9] Plaintiffs fare no better if we assume for the sake of argument that they could tender a third party taking claim, i.e., without showing that they are a person affected by the regulation. For example, plaintiffs assert that since under the Plan new coverage is effectively precluded in "stream environmental zones" [SEZ] the Plan is amenable to a facial attack with respect to that aspect. However, it cannot be said from looking at the face of the Plan that such rule necessarily results in a taking. (Once again, assuming for the sake of argument that barring new development here is not justified under the nuisance exception to the takings prohibition.) The rule as to SEZ's could only result in a facial taking if it were incontestable

granting judgment on the pleadings to plaintiffs' facial taking claim in their penultimate complaint.

## A.

"[A] claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." (*Williamson Planning Comm'n.* v. *Hamilton Bank* (1985) 473 U.S. 172, 186 [87 L.Ed.2d 126, 139, 105 S.Ct. 3108].) Here, none of the landowner plaintiffs alleges that a waste discharge requirement for a proposed development was sought. As the Water Board notes, the Plan does not establish the classification of *parcels* of property. It sets forth a methodology for ascertaining the appropriate classification and presumptively places land in zones bearing that classification. The general classification scheme assumes that all of the land within a zone shares the characteristics arrived at by application of the land classification methodology. However, the methodology is amenable to specific application to a parcel of property and the reviewing body has interpretive latitude in making that determination. (Cf. *California Tahoe Regional Planning Agency* v. *Day & Night Electric, Inc., supra,* 163 Cal.App.3d at p. 901.) The exercise of this interpretive latitude is assigned in the first instance to the regional water quality control board that must pass upon a request for a waste discharge requirement.

Plaintiffs argue that they should not be required to obtain a determination of classification from the regional water quality control board because they have alleged in the complaint the land classifications of their parcels. They rely upon their good faith belief that these allegations are correct and assert that the classification of their parcels under the system incorporated into the Plan is "inexorable and inevitable." But the plaintiffs cannot by means of alleging conclusions plead themselves into a *facial* challenge to the constitutionality of the Plan. ■ Where, as here, administrative means are at hand by which an individual plaintiff may escape the strictures of the Plan, the burden of pleading compliance with that means is on the plaintiffs. Carrying that burden is a condition for obtaining an adjudication of the

---

that there is land subject to the rule for which there is no feasible economic use that does not require new coverage. But it is not self-evident that there is such land for which there are categorically no feasible alternative uses. That question turns upon the nature and character of particular parcels and the economic viability of alternative uses that may be available depending, for example, upon the terrain, location, and customs of land usage. To attack the rule plaintiffs must adduce an evidentiary showing that the application of the rule to their land would leave them without a viable economic use. That is to say they must attack the rule *as applied* to a particular piece of property.

constitutionality of the state's adoption of the Plan. As related, such adjudication is not lightly to be undertaken. Plaintiffs' assertion that the specific application of the land classification scheme to their property would be a foregone conclusion in administrative proceedings before the regional water quality control board is not backed by a persuasive showing that it is correct. It is belied by analogous authority emanating from this court. (See *Day and Night Electric, supra,* 163 Cal.App.3d 901.) Absent such backing it cannot be accepted.

Plaintiffs' remaining rejoinder to the Water Board's prematurity argument is that applying for a waste discharge requirement is necessarily a futile act. Plaintiffs argue that because of the Plan's narrative standard of compliance they could never establish conformity with the standard. However, this argument is founded on the unsupported view that there is no possibility of obtaining a more favorable land classification in waste discharge requirement proceedings before the regional water quality control board.[10]

---

[10] We note that the concerns which undergird ripeness doctrine also require the landowner plaintiffs to show that but for the Plan they would have been able to build at the time of the alleged taking by the Plan. Plaintiffs have not alleged facts showing that a denial of a waste discharge requirement allowing development was *the* cause of the claimed diminution in value of their parcels. No plaintiff alleges formulation of an actual development proposal and pursuit of such a proposal by obtaining or attempting to obtain the other permits that are a prerequisite to development. We shall assume that such matters need not be pled, or that it would be unfair to uphold the judgment on the basis of such a pleading defect without granting an opportunity for amendment. Nonetheless, in the absence of an attempt to develop the parcels, proof that development at any particular point in time was precluded solely by reason of the Plan would present knotty and perhaps insurmountable problems.

Plaintiffs concede that before they could begin development of their parcels they must obtain sewer permits from the local sanitation district, a county building permit, and a Tahoe Regional Planning Agency building permit, in addition to a waste discharge requirement under the Plan. They implicitly concede that they have not obtained these prerequisites since their briefing on the point asserts that such permits either are or were: available from the pertinent government entity; limited but obtainable in a private (transfer) market for a price; or unavailable but that the question of availability is being litigated. Assuming that plaintiffs could address the causation question in this abstract manner, showing the probable aggregate effect of the various restrictions over time could cross the border between acceptable proof and speculation. The better, perhaps the only, way to show that development is precluded by the Plan in this context would be to formulate a proposal and pursue it to the point where the Plan is the only remaining obstacle.

The development of land in the Lake Tahoe basin is subject to multiple layers of restriction by various government entities; local, state, interstate, and federal. The Plan itself alludes to an independent restriction on the number of sewer permits available for residences. The Tahoe Regional Planning Compact (Gov. Code, §§ 66800-66801) limited the number of building permits for residential units during 1980, 1981, 1982, and portions of 1983. Plaintiffs' theory in the complaint, as to the parcels alleged to be classified so some coverage is permitted, is that the preclusion of development is caused by the combination of the maximum coverage restrictions of the Plan and the local zoning ordinance requirements for minimal coverage. Yet there is no indication of submission of a development proposal conforming to coverage

## B.

■ That brings us to the question of prematurity for failure to seek just compensation. A takings claim is also not ripe until the claimant has sought and been denied just compensation through available adequate procedures for obtaining compensation. (*Williamson Planning Comm'n. v. Hamilton Bank, supra,* 473 U.S. at pp. 194-197 [87 L.Ed.2d at pp. 143-145].) "[I]f a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation." (*Id.,* at p. 195 [87 L.Ed.2d at p. 144].)

The Lake Tahoe Acquisitions Bond Act (Act) provides a funded program "[f]or the acquisition of undeveloped lands threatened with development that will adversely affect the [Tahoe basin's] natural environment . . . ." (Gov. Code, § 66957, subd. (a).) "In particular, preference shall be given to the acquisition of undeveloped lands within stream environment zones and other undeveloped lands that, if developed, would be likely to erode or contribute to the further eutrophication or degradation of the waters of the region due to that or other causes." (Gov. Code, § 66957, subd. (a).) It appears that the Act provides a source of compensation for the plaintiff landowners. Accordingly, we requested briefing on whether the Act is a procedure for obtaining just compensation within the meaning of *Williamson Planning Comm'n v. Hamilton Bank, supra.*

Plaintiffs' sole argument on the point is that the amount of compensation actually available under the Act is not just compensation. Government Code section 66959 is as follows. "If the value of any land to be purchased by the agency has been substantially reduced by any statute, ordinance, rule, regulation, or other order adopted after January 1, 1980, by state or local government for the purpose of protecting water quality or other resources in the region, the agency may purchase the land for a price it determines would assure fairness to the landowner. In determining the price to be paid for the land, the agency may consider the price which the owner originally paid for the land, any special assessments paid by the landowner, and any other factors the agency determines should be considered to ensure that the landowner receives a fair and reasonable price for the land."

Plaintiffs argue that the terms of this statute permit payment of less than just compensation as measured by fair market value at the time of the alleged taking. They assert that it has been the practice under the Act to

---

restrictions of the Plan and refusal of a variance by the local zoning authorities. (We imply no view on how a taking, if any, attributable to such a regulatory composite should be remedied under *Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266 [157 Cal.Rptr. 372, 598 P.2d 25].)

offer amounts less than just compensation as measured by this standard. The plaintiffs' argument is unpersuasive because nothing in the text of the Act precludes payment of an amount equal to just compensation and their bare factual assertion of the practice under the Act cannot be accepted as accurate for appellate purposes. As with independent development strictures briefly noted *ante,* at footnote 9, the only sure way to ascertain the amount that would be offered under the Act is to solicit an offer from the authorities who administer it. Certainly plaintiffs are free under the text of the Act to argue in such negotiations that the amount that should be offered to assure fairness and to avoid potential detrimental development, in view of potential takings claims, is fair market value as they view it.

However, there are considerations, unaddressed by the parties, which impel us not to rest the disposition of this appeal upon failure to seek compensation under the Act. The essential problem is that the Act was enacted after the filing of plaintiffs' original complaint; albeit before the amendment of the complaint to allege a claim of a taking by the Plan as applied. The result of these circumstances is not obvious. Perhaps when such a program is enacted after a claimed taking by overregulation the action should be abated and resort to the program required in order to determine if the claim has become moot. Such a course of action might be prudent since otherwise under the *Agins* approach of invalidation of the regulation the state's policy could be frustrated unnecessarily. Since we have decided that plaintiffs' takings claims are not ripe in any event, we decline to render an advisory opinion on the abatement point. If plaintiffs renew the takings claim proffered in this case it would be prudent first to seek compensation under the Act. In view of the foregoing none of the other points raised by the parties warrants discussion.

## DISPOSITION

As to plaintiffs' claims of takings by unreasonable overregulation the judgment is modified to one of dismissal on the ground that the claim is not ripe for the reasons given in this opinion. As so modified, the judgment is affirmed. The parties shall recover their own costs on appeal.

Puglia, P. J., and Evans, J., concurred.

A petition for a rehearing was denied June 28, 1989, and the opinion was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied September 21, 1989. Panelli, J., did not participate therein.