Filed 3/30/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| CHARLES CONWAY, JR., et al.,<br><br>  Plaintiffs and Appellants,<br><br>v.<br><br>STATE WATER RESOURCES<br>CONTROL BOARD et al.,<br><br>  Defendants and Respondents. | 2d Civil No. B252688<br>(Super. Ct. No. 56-2011-<br>399391-CU-WM-VTA)<br>(Ventura County) |

McGrath Lake is polluted. The Regional Water Quality Control Board has established the total maximum daily load (TMDL) of pollutants allowed in the lake. Owners of private property within which a portion of the lake is located will likely be held responsible for remediation of the pollution. They contend the TMDL may not be stated in terms of concentration of pollutants in lake bed sediment. The trial court denied their petition for a writ of mandate. The lake is its water and its sediment. We affirm.

FACTS

*BACKGROUND*

McGrath Lake, situated at the southern end of McGrath State Beach Park, has about 12 acres of surface area. It is located in the McGrath Lake subwatershed. The subwatershed is approximately 1,200 acres consisting primarily of agricultural fields, petroleum facilities, park land, public roads and a closed landfill. The primary activity in the subwatershed is agriculture. McGrath Lake receives runoff from the agricultural

lands. Much of the runoff reaches the lake by a ditch known as the Central Ditch. The lake is a terminal lake; that is, it has no natural outlet. McGrath Lake including its lake bed sediment is polluted with pesticides and polychlorinated byphenyls (PCBs). The federal Water Pollution Control Act, also known as the Clean Water Act (33 U.S.C. § 1251 et seq.), requires all states to identify polluted water bodies within their jurisdictions. (*Id.*, § 1313(d).) For all such water bodies the state must set "total maximum daily load[s]." (*Ibid.*) A TMDL is the maximum amount of pollutants (or load) that a water body can receive from point and nonpoint sources. (40 C.F.R. § 130.2(i).) A point source is a discrete discharge source such as the Central Ditch; a nonpoint source is any other type of source. (See *Tahoe-Sierra Preservation Council v. State Water Resources Control Bd.* (1989) 210 Cal.App.3d 1421, 1425, fn. 2.)

California implements the Clean Water Act through the Porter-Cologne Water Quality Control Act (Wat. Code, § 13000 et seq.) Under the Porter-Cologne Act, the State Water Resources Control Board (State Board) is charged with implementing the federal act including the development of TMDLs. (*Id.*, §§ 13160; 13191.3, subd. (a).) Regional Water Quality Control Boards (Regional Board) regulate the quality of water within their regions under the purview of the State Board. (See *City of Arcadia v. State Water Resources Control Bd.* (2006) 135 Cal.App.4th 1392, 1405.) Regional Boards adopt water quality control plans, commonly called "basin plans." (*Ibid.*) A Regional board may establish TMDLs by amendment to the basin plan. (*Id.* at p. 1406.)

*Basin Plan Amendment*

The Regional Board's Basin Plan Amendment established TMDLs for McGrath Lake for two sources of pollution. One source is pollutants coming into the lake from the Central Ditch. The TMDL for this source of pollution is not disputed.

The second source is pollutants in the lake bed sediment. These pollutants can enter the water column of the lake by, among other means, desorption. The TMDL for this source is not stated in terms of pollutants coming into the lake's water column or in the water column itself. Instead, the TMDL is stated in terms of concentrations of

2

pollutants in the sediment. The Basin Plan Amendment sets a goal of 14 years to achieve the TMDL for the lake bed sediment.

The Basin Plan Amendment does not mandate any particular method of remediation. It notes, however, that natural attenuation of the pollutants would take longer than 14 years, leaving capping or dredging as possible methods of remediation.

The Basin Plan Amendment includes landowners within the lake's watershed among persons and entities optimistically designated as "cooperative parties." The amendment gives cooperative parties two years from the effective date of the TMDL to enter into a Memorandum of Agreement (MOA) with the Regional Board to implement the TMDL. If the cooperative parties fail to obtain an MOA within two years or do not comply with the terms of the MOA, the executive officer of the Regional Board shall "(1) identify the responsible parties, whether named in this TMDL or not, whose discharges of the legacy pollutants have caused or contributed to the impairment of the lake; (2) ascertain the whereabouts and capacities of those responsible parties and/or their successors; (3) determine the parties to whom responsibility for remediation of sediments should be assigned; and (4) issue appropriate regulatory orders to those responsible parties."

After a public hearing, the Regional Board adopted the Basin Plan Amendment establishing TMDLs for McGrath Lake. The amendment was approved by the State Board, the Office of Administrative Law and the federal Environmental Protection Agency (EPA).

*Petition for Writ of Mandate*

Charles J. Conway, Jr., Colleen Conway, Helen G. Haynes, William Berg, Marilyn Berg, Madge McKee and Bill McKee (collectively "Conway") petitioned for a writ of mandate. They alleged the Basin Plan Amendment violates the Clean Water Act, Water Code section 13360, and the California Environmental Quality Act (CEQA). They further alleged they have an undivided 75 percent interest in 60 acres of land within which the northern portion of McGrath Lake is located. They allege they are harmed by the Basic Plan Amendment in that the State and Regional Boards will hold them

3

responsible for the remediation of the pollution. They request the court declare the Basin Plan Amendment void and to vacate the State and Regional Boards' adoption and approval of the amendment.

In its answer, the Regional Board admitted that it is informed and believes Conway owns an interest in land in which a portion of McGrath Lake is located; that Conway is legally responsible for some or all of the pollution in the McGrath Lake; and that if Conway does not conform to the Basin Plan Amendment and MOA, it may take action against him.

The trial court denied the petition.

DISCUSSION

I.

Conway contends the Regional Board cannot set load allocations expressed only in terms of concentrations of pollutants contained in lake bed sediment.

Conway argues a TMDL can only regulate the movement of pollutants into the water column. Conway points to the Code of Federal Regulations definition of a "Load" as the "amount of matter [contaminants] introduced into a receiving water." (40 C.F.R. § 130.2(e).) He claims the lake bed sediment is not part of the "receiving waters."

But the sediment is wet, it is intermixed with the lake waters and it is part of the lake. The Regional Board could reasonably determine that the lake bed sediment is not, as Conway argues, a distinct physical environment. Instead, the lake waters and the lake bed sediment form a single physical environment.

Conway cites *Pronsolino v. Marcus* (N.D. Cal. 2000) 91 F.Supp.2d 1337, 1352, for the proposition that streambed sediment is a "discharge" under the Clean Water Act. From this Conway concludes "if re-suspension of lake bed sediment is a discharge into the lake, then that lake bed sediment itself cannot be part of the receiving waters (since one cannot logically discharge from a receiving water into the same receiving water.)" But one can discharge a pollutant from one part of the receiving waters into another part of the same receiving waters. In fact, all pollution spreads from one part of the receiving waters into another part.

4

If the Regional Board were required to express load allocations in terms of the movement of pollutants, we presume the federal regulation that specifies how TMDLs may be expressed would have said so.  Instead, EPA regulations provide that "TMDLs can be expressed in terms of either mass per time, toxicity, or other appropriate measure."  (40 C.F.R. § 130.2(i).)  Thus the regulations give the Regional Board broad authority to select an "appropriate measure."  Nothing in the regulations, or elsewhere, prohibits the Board from expressing TMDLs in terms of concentrations of pollutants in sediment.

The Regional Board determined that a concentration based TMDL is appropriate for two reasons.  First, because the lake has no natural outlets, pollutants do not regularly flush out.  Expressing TMDLs in terms of mass per time, such as kilograms entering the lake per year, would mean that pollutants in the lake bed would never be reduced to levels sufficient to meet federal and state standards.  Second, it is not technically feasible to measure the levels of pollutants desorbing from lake bed sediments to the water column all along the lake bottom with any degree of accuracy.

Conway argues there is no evidence that lack of natural outlets to the lake has any relevance to the manner in which TMDLs "must be expressed."  He claims any such inference is based on unsupported speculation.  (Citing *Malkasian v. Irwin* (1964) 61 Cal.2d 738, 747 [counsel may not invite the jury to speculate as to unsupported inferences].)

That McGrath Lake has no natural outlets is relevant to show that pollution will not be removed from sediment by the natural flow of water through the lake.  Thus a TMDL may be appropriately stated in terms of pollution remaining in the sediment.  As we have stated, federal regulations give the Regional Board broad authority to determine the appropriate measure for a TMDL.

Conway argues that the second reason given by the Regional Board for expressing the TMDL in terms of concentration of pollutants is not supported by the evidence.  The second reason is that it is the only practical method of stating the TMDL.

5

But it is irrelevant that there may be other methods of stating the TMDL. The Regional Board has broad discretion to choose any reasonable method. It has done so.

Conway argues the "impermeable barrier example" illustrates why a TMDL stated in terms of concentrations of pollution is not legally sound. Conway points out that if an impermeable barrier is placed over the lake bed, it would completely prevent any contamination from reaching the water. But the lake bed sediment would still be contaminated, he argues, and thus, would still violate the TMDL.

The flaw in Conway's argument is that the impermeable barrier would be a new uncontaminated lake bed that would comply with the TMDL. The old contaminated sediment would no longer be part of the lake bed, and would not have to comply with the TMDL. In fact, such capping of the sediment is one method of remediation mentioned in the Basin Plan Amendment.

Conway argues allowing the Regional Board to express TMDLs in terms of concentration presents a slippery slope. Conway posits that such a rule would allow the Regional Board to regulate pesticide use on agricultural lands located miles from McGrath Lake without regard to the amount of pesticides actually being loaded into the lake.

But slipping down the slope stops where application of a law or regulation becomes unreasonable. (See *Cedars of Lebanon Hosp. v. County of L.A.* (1950) 35 Cal.2d 729, 735 ["a fair and reasonable interpretation must be made of all laws"].) If it would be unreasonable or absurd to interpret the law and regulations as applying to land miles from the lake, the law and regulations will not be so interpreted. Here we are not concerned with land miles from the lake, but with the lake bed itself.

Finally, we give deference to an agency's interpretation of its regulations, so long as the interpretation is reasonable. (See *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* (1984) 467 U.S. 837, 844.) Here the EPA approved the Board's TMDL as applied to the lake bed sediment. For the reasons stated above, the EPA's interpretation of its regulations was reasonable.

6

II.

Conway argues the TMDL violates Water Code section 13360, subdivision (a).

Water Code section 13360, subdivision (a) provides in part: "No waste discharge requirement or other order of a regional board or the state board or decree of a court issued under this division shall specify the design, location, type of construction, or particular manner in which compliance may be had with that requirement, order, or decree, and the person so ordered shall be permitted to comply with the order in any lawful manner."

Conway concedes the Basin Plan Amendment does not expressly require dredging or any other method of remediation. Instead, Conway argues dredging is the only practical way of meeting the 14-year deadline for achieving lake bed sediment load allocations. Conway claims natural attenuation would take too long and the lake is too shallow for capping.

But it has not been determined that dredging is the only practical method of remediation. That is the subject of the MOA to be negotiated between the cooperative parties and the Regional Board. In any event, even assuming dredging is the only practical method of remediation, Conway's argument has two fatal flaws: First, Water Code section 13360, subdivision (a) does not apply on its face. The TMDL is neither a "waste discharge requirement or other order." It does not require or order anything. Second, where lack of available alternatives is a constraint imposed by present technology and the law of nature, rather than the Board specifying a particular manner of compliance, there is no violation of Water Code section 13360. (*Tahoe-Sierra Preservation Council v. State Water Resources Control Bd.*, *supra*, 210 Cal.App.3d at p. 1438.)

III.

Conway contends the Board failed to comply with the CEQA. (Pub. Resources Code, § 21000 et seq.)

7

The Basin Plan Amendment that adopted the TMDLs is a certified regulatory program. (*Id.*, § 21080.5, subd. (b)(2); Cal. Code Regs., tit. 14, § 15251, subd. (g).) A certified regulatory program is exempt from the requirement of an Environmental Impact Report (EIR) (Pub. Resources Code, § 21080.5, subd. (c)).) Nevertheless, there must be significant documentation. The document used as a substitute for an EIR must include a description of the proposed activity with alternatives to the activity and mitigation measures as well as written responses to significant environmental points raised during the evaluation process. (*Id.*, subds. (d)(2)(D) & (d)(3)(A); Cal. Code Regis., tit. 14, § 15252, subd. (a).)

A certified regulatory program is subject to the broad policy goals and substantive standards of CEQA. (*City of Arcadia v. State Water Resources Control Bd.*, *supra*, 135 Cal.App.4th at p. 1422.) It is said that the substitute documents serve as the functional equivalent of an EIR. (*Ebbetts Pass Forest Watch v. Cal. Dept. of Forestry and Fire Protection* (2008) 43 Cal.4th 936, 943.)

An EIR prepared for a program, plan, policy, or ordinance may be tiered. (Pub. Resources Code, § 21094, subd. (a).) The first tier concentrates on the program, plan, policy, or ordinance, and later EIRs discuss application to a particular project. (See *In re Bay Delta-Programmatic EIR Coordinated Proceedings* (2008) 43 Cal.4th 143, 1169.)

A TMDL is an informational document, not an implementation plan. (*American Farm Bureau Fed. v. U.S. Environ. Protec. Agency* (M.D. Pa. 2013) 984 F.Supp.2d 289, 326.) It does not by itself prohibit any conduct or require any actions. (*City of Arcadia v. U.S. Environ. Protec. Agency* (N.D. Cal. 2003) 265 F.Supp.2d 1142, 1144.) Instead, a TMDL represents a goal for the level of a pollutant in a water body. (*Ibid.*) Thus only a first-tier analysis is necessary.

Conway argues the substitute documents inadequately analyze the environmental impacts of and economic factors associated with dredging. But dredging is a remediation measure. A TMDL does nothing more than establish maximum loads.

8

Remediation measures are beyond the scope of the TMDL; thus, beyond the scope of the first tier environmental analysis necessary for a TMDL.

Conway argues the only practical method of remediation is dredging. That has not been determined. The Basic Plan Amendment calls for the cooperative parties and the Regional Board to work together to formulate a memorandum of agreement on how the TMDL for lake sediment will be implemented. Until such a plan is formulated, a full environmental analysis of any particular method of remediation is premature. If dredging is indeed chosen as the method, a full analysis can be made on a second tier.

The judgment is affirmed. Costs are awarded to respondents.

CERTIFIED FOR PUBLICATION.

GILBERT, P. J.

We concur:

YEGAN, J.

PERREN, J.

Frederick H. Bysshe, Jr., Judge

Superior Court County of Ventura
_____

Hinson Gravelle & Adair, Douglas A. Gravelle, Law Offices of Charles J. Conway, Jr., Charles J. Conway, Jr., for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Robert W. Byrne, Senior Assistant Attorney General, Gary E. Tavetian and Eric M. Katz, Supervising Deputy Attorneys General, , Deputy Attorney General, for Defendants and Respondents.